701 S.E.2d 5

Jesse BRANHAM, Jr., as Guardian ad Litem
for Jesse Branham, III, and Jesse
Branham, Jr., Respondent,

v.

FORD MOTOR COMPANY and Cheryl Jane Hale, Defendants,

Of Whom Ford Motor Company is the Appellant.

No. 26860.

Supreme Court of South Carolina.

Heard April 9, 2009.
Decided Aug. 16, 2010.
Rehearing Denied Nov. 17, 2010.

204

206

C. Mitchell Brown, William C. Wood, Jr., Beth Burke Richardson, and A. Mattison Bogan, all of Nelson Mullins Riley & Scarborough, of Columbia, Elbert S. Dorn and Nicholas W. Gladd, both of Turner, Padgett, Graham & Laney, PA, of Columbia, for Appellant.

John R. Hetrick and Robert J. Bonds, both of Hetrick, Harvin & Bonds, of Walterboro, Ronnie L. Crosby, John E. Parker, Grahame E. Holmes, all of Peters, Murdaugh, Parker, Eltzroth & Detrick, PA, of Hampton, for Respondent.

Justice KITTREDGE.

This is a direct appeal in a product liability case tried to a jury in Hampton County. The jury awarded the plaintiff $16,000,000 in actual damages and $15,000,000 in punitive damages. We affirm in part, reverse in part and remand for a new trial.

## I.

This product liability action involves a 1987 Ford Bronco II 4x2, manufactured in 1986. Cheryl Hale (or her husband) purchased the 1987 Ford Bronco in June of 1999 for a nominal sum.[1] At the time of sale, the Bronco had 137,500 miles on it.

On June 17, 2001, Hale was driving her Bronco along Cromwell Road in Colleton County. Hale was driving several children to her house. Hale's daughter was seated in the front passenger seat. Plaintiff Jesse Branham, III, was riding in the backseat. Hale recalled that the children were "all excited." No one was wearing a seatbelt.

The weather was clear and, according to Hale, she was not speeding. Hale admittedly took her eyes off the road and turned to the backseat to ask the children to quiet down. When she took her eyes off the road, the Bronco veered towards the shoulder of the road, and the rear right wheel left

---

1. A document referenced during Hale's testimony indicates a purchase price of $150.

the roadway. When Hale realized that her inattention resulted in the vehicle leaving the roadway, she responded by overcorrecting to the left. Hale's overcorrection led to the vehicle "shaking." The vehicle rolled over. Branham was thrown from the vehicle and was injured.

Branham filed this lawsuit against Ford Motor Company and Hale in Hampton County. At trial,[2] Branham did not seriously pursue the claim against Hale. The case against Ford was based on two product liability claims, one a defective seatbelt sleeve claim and the other, a "handling and stability" design defect claim related to the vehicle's tendency to rollover. Both of these claims were pursued in negligence and strict liability.[3] Ford denied liability and, among other things, asserted Hale's negligence caused the accident. The jury, in a general verdict,[4] found both Ford and Hale responsible and awarded Branham $16,000,000 in actual damages and $15,000,000 in punitive damages. Only Ford appeals. The direct appeal is before us pursuant to Rule 204(b), SCACR, certification.

## II.

### A.

#### The Seatbelt Sleeve Negligence Claim

Branham alleged Ford was negligent "[i]n selling the Bronco II with a defective rear occupant restraint system." The amended complaint contains no specifications of Ford's purported negligence. At trial, Branham claimed Ford was negligent in failing to adequately test the seatbelt sleeve, but he did not challenge the seatbelt sleeve design. Branham filed a companion strict liability claim concerning the seatbelt

---

2. This was the second trial of this case. The first trial ended in a mistrial when it was discovered that one or more jurors had been represented by the law firm representing one of the parties.

3. Branham also alleged warranty claims in his complaint but did not pursue these claims at trial, and the jury was not asked to consider these claims.

4. The unusual verdict form is discussed in detail in Part III.D, *infra.* Ford's request that the jury answer specific interrogatories related to the multiple claims was denied.

sleeve. Ford successfully moved for a directed verdict on the strict liability seatbelt sleeve claim.

The trial court dismissed the strict liability claim on the ground that the seatbelt sleeve was not as a matter of law in a defective condition unreasonably dangerous to the user at the time of manufacture. Based on this premise, Ford contends the companion negligence claim must fail, for all products liability actions, regardless of the stated theory, have common elements. *Madden v. Cox,* 284 S.C. 574, 579, 328 S.E.2d 108, 112 (Ct.App.1985) ("In a products liability action the plaintiff must establish three things, regardless of the theory on which he seeks recovery: (1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user."). Ford, therefore, concludes that the negligence claim (which required Branham to prove that the seatbelt sleeve was in a defective condition unreasonably dangerous to the user) should have been dismissed. We agree. When an element common to multiple claims is not established, all related claims must fail.

■ A negligence theory imposes the additional burden on a plaintiff "of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault." *Bragg v. Hi–Ranger, Inc.,* 319 S.C. 531, 539, 462 S.E.2d 321, 326 (Ct.App.1995). The fault-based element is of no moment where, as here, there is no showing in the first instance of a product in a defective condition unreasonably dangerous to the user.

In addition, Ford asserts there is no separate "failure to test claim" apart from the duty to design and manufacture a product that is not defective and unreasonably dangerous. We agree, for if a product is not in a defective condition unreasonably dangerous to the user, an alleged failure to test cannot be the proximate cause of an injury. The failure to establish that the seatbelt sleeve was in a defective condition unreasonably dangerous to the user for purposes of the strict

liability claim requires the dismissal of the companion negligence claim.

Relying on *Bragg,* the trial court determined it appropriate to grant a directed verdict on the strict liability claim, while at the same time allowing the negligence claim to go forward. We find the trial court's reliance on *Bragg* misplaced.

In *Bragg,* the trial court directed a verdict in favor of the manufacturer with respect to the strict liability claim, but refused to grant a directed verdict on the negligence claims. 319 S.C. at 538, 462 S.E.2d at 325. Bragg alleged two negligence claims: negligence "in failing to place appropriate warnings" on the product and another negligence claim "in supplying [a product] that was defective[ly] [designed]." *Id.* at 537–38, 462 S.E.2d at 325. The jury returned a verdict against Bragg on the negligence claims.

Bragg appealed the dismissal of the strict liability claim, "contend[ing] the court's decision to grant the motion for directed verdict on strict liability, while denying the motion for directed verdict on negligence, was logically inconsistent and reversible error because those claims are virtually identical and require the same proof." *Id.* at 538, 462 S.E.2d at 325. The court of appeals in *Bragg* affirmed the trial court and noted that "[s]trict liability and negligence are not mutually exclusive theories of recovery; that is, an injury may give rise to claims that can be established either under principles of strict liability or negligence, and failure to prove one theory does not preclude proving the other." *Id.* at 539, 462 S.E.2d at 326.

While we agree that strict liability and negligence are not mutually exclusive theories of recovery, we caution against a broad reading of *Bragg* in this regard. An analytical framework that turns solely on whether strict liability and negligence are mutually exclusive theories of recovery may miss the mark. As noted, the negligence claim must have a fault-based element, which is not required for a strict liability claim. Where one claim is dismissed and a question arises as to the continuing viability of the companion claim, the critical inquiry is to ascertain the basis for the dismissal. If one claim is dismissed and the basis of the dismissal rests on a common

element shared by the companion claim, the companion claim must also be dismissed.

In the present case, because the strict liability claim was dismissed due to the absence of an element shared by the companion negligence claim, the negligence claim should have been dismissed as well.

The trial court determined as a matter of law that the seatbelt sleeve was not in a defective condition unreasonably dangerous to the user. Consequently, the absence of this common, shared element required the dismissal of the strict liability claim *and* the companion negligence claim.[5] The trial court erred in failing to direct a verdict as to the negligence seatbelt sleeve claim.[6]

## B.

### *The "Handling and Stability" Design Defect Claim*

■ The "handling and stability" design defect claim (strict liability and negligence) is the gravamen of Branham's case. Branham alleged a design defect related to the rollover propensity of the Bronco. Ford appeals from the denial of its motions to dismiss the strict liability and negligence design defect claims. Viewing the evidence in a light most favorable to Branham, we find no error in the submission of these design defect claims to the jury. *Pye v. Estate of Fox*, 369 S.C. 555, 564, 633 S.E.2d 505, 509 (2006) (stating that on appeal from the denial of a directed verdict motion, the evidence must be viewed in a light most favorable to the nonmovant).

We begin with an overview of the technical information involved in the design defect claims. Ford uses the term "stability index" to describe the overall stability of a vehicle. The stability index is a comparison of the height and width of

---

**5.** The converse of the situation before us is more easily understood, that is, where the negligence claim is dismissed and the strict liability survives, as questions of fact are presented as to elements common to both claims yet the plaintiff fails to present evidence of the absence of due care.

**6.** On appeal, Branham seeks to challenge the trial court's dismissal of the strict liability seatbelt claim. Issue preservation rules aside, we have reviewed the evidence concerning the seatbelt claim and conclude the trial court properly directed a verdict.

the vehicle, expressed in a numerical term. A closely connected term is the center of gravity. A vehicle's center of gravity relates to what one usually thinks of as "top heavy" or "stable." The lower the center of gravity in a vehicle, the more stable it is. Conversely, the higher the center of gravity (top heavy), the less stable the vehicle is.

The stability of a vehicle is related in part to its suspension. According to Branham's expert, Dr. Melvin Richardson, a vehicle with a stable suspension is able to make a turn in the road, and "as the vehicle goes around the curve, it leans over some and ... the tires stay the same distance apart where they touch the ground." A vehicle with an unstable suspension will cause the tires to "scrub" the ground during a turn, which "cuts down friction, [and] increases tire wear," causing the vehicle to handle poorly. When a vehicle is turning and the tires begin to scrub, "you lose some of [the tire's] capabilities to keep the vehicle going in the right direction and lose some of the ability to control the vehicle."

Ford primarily employed two engineering tests as a means of determining whether the Bronco II was ready for manufacturing. The first test is called a "J" turn. In this test, as described by Dr. Richardson, the vehicle is driven down a roadway, and "as quickly as possible the driver turns [the wheel to a] predetermined angle and just holds it there" for the remainder of the turn.

The second test is called an accident avoidance maneuver test. This is where the vehicle is turned in an abrupt fashion one way, like in the "J" turn, but with the added maneuver of an immediate turn back in the opposite direction. With these engineering concepts in mind, we turn to the design defect evidence presented.

Thomas Feaheny, a former vice president at Ford, testified for Branham. Feaheny described the marketing forces and engineering insights that led to the development of the Bronco II. The genesis of the Bronco II spawned from the YUMA Program, which came into being in the late 1970s. YUMA was Ford's code name for the study of small trucks, which eventually resulted in the Ford Ranger, and later the Bronco II. The YUMA prototypes initially had a MacPherson front suspension, which, according to Feaheny, is a "type of inde-

pendent front suspension that is used on a lot of small cars and trucks." Ford's engineers requested the MacPherson front suspension for the Bronco II when communicating with management on how best to address the Bronco II's handling and stability concerns raised during the prototype stage.

Feaheny opined that the MacPherson strut was the "best, most feasible suspension from a functional standpoint and also from a cost and weight standpoint." However, there was a divergence in viewpoints between corporate executives and engineers, as Ford's engineers advocated the use of the MacPherson strut for the small truck program. Since the mid-1960s Ford had employed a Twin I–Beam suspension on its bigger trucks. Feaheny testified that "there was a belief that [Ford] should adapt [the] Twin I–Beam suspension to the new small trucks."

The engineers at Ford believed the MacPherson suspension the better choice and "opposed [the Twin I–Beam suspension] because it was directionally wrong from the standpoint of steering, handling and rollover propensity and other characteristics." Because the Twin I–Beam suspension was physically larger than the MacPherson suspension, using it required the entire vehicle to be lifted higher. This had a cascading effect on the composite makeup of the vehicle, which detrimentally moved the center of gravity higher off the ground. To make room for the Twin I–Beam suspension, the engine had to be raised "two to three" inches. With the engine raised a few inches, the transmission had to be raised, which caused the hood to be raised, which then caused the seating to be raised. The net effect of this was a higher center of gravity, "which add[ed] a rollover propensity."

Feaheny also noted that the Twin I–Beam had a tendency for "jacking." Feaheny stated that jacking is a term used to describe an occurrence when the "vehicle will slide out in a severe handling maneuver. The outboard wheel would tend to dig into ... the suspension arm, which was strong and stiff, [and it] would have to move with that wheel and the inner pivot would go up in the air." When a vehicle jacks, there is an instantaneous raising of the center of gravity, which further "increase[s] the propensity for rollover."

Use of the Twin I–Beam and its attendant safety concerns came to a head in the late 1970s. A group of engineers approached Feaheny and recommended that Ford use either the MacPherson suspension or the SLA (short long arm) suspension for the YUMA prototypes. The engineers made it clear that they were "very concerned" with the Twin I–Beam. Feaheny directed the engineers to one of his colleagues, Jim Capalongo, and Feaheny later met with Capalongo to discuss the engineers' concerns. After this meeting, alternative suspension designs were discussed and tested for "about a year" but the Twin I–Beam was still selected.

The reason the Twin I–Beam was selected in the face of engineering concerns was that it served a "major marketing advantage," as Ford had promoted this form of suspension on its full size trucks since the mid–1960s. In the minds of the marketing executives, the Twin I–Beam was part and parcel of a tough truck, and it made business sense to carry that suspension into the smaller trucks.

The testimony of Dr. Richardson buttressed the evidence supplied by Feaheny and Ford's internal documents. Dr. Richardson opined that the use of the Twin I–Beam suspension led to the Bronco II being unreasonably dangerous. Dr. Richardson described three common suspension systems referenced above: (1) the SLA; (2) the MacPherson; and (3) the Twin I–Beam. It was through Dr. Richardson that Branham introduced many of Ford's internal documents showing the competing concerns and interests of the engineers and management over the proper suspension.

The Bronco II was designed from the existing "bones" of the Ford Ranger. Dr. Richardson opined that using the Ranger as the design platform was an appropriate engineering decision, and that it gave Ford the advantage of using components that had already been made.

Dr. Richardson testified to a Ford document dated February 5, 1981, and titled "Revised Stability Index for Utility." The stated objective of the document was to "review alternatives to increase stability index." Reading from the document, he stated that, "a study of methods to improve the stability index for the Bronco II has resulted in several design alterna-

tives to achieve an improvement ... from 1.85 to maximum achievable of 2.25 without a totally new concept vehicle."

The document made a general assessment about improving the stability index. "In order to improve stability index substantially, the following are required: widen track width, and lower center of gravity achieved by raising the wheel center lines with respect to body with trade-offs in ground clearance and vehicle package." The document also made five proposals to achieve a higher stability index. The first two proposals did not jeopardize the target release date for the Bronco II, but the latter three did. Only one of the proposals would have achieved a stability index of 2.25 for the Bronco II, but it was not selected.

Ford selected what is referred to as "proposal two," and it had a target stability index of 2.02. Dr. Richardson pointed out that proposal two saved Ford money. None of the proposals on this document argued for a change in the suspension system. But Dr. Richardson opined that had Ford opted to use an SLA or a MacPherson suspension system, then it could have achieved a stability index of 2.25. At that point, however, Ford had already decided to employ the Twin I–Beam suspension notwithstanding its engineers' criticisms.

Dr. Richardson testified to Plaintiff's exhibit 31, dated March 17, 1982, which discussed "J" turn testing for the Bronco II. In relevant part, the document stated the following:

Engineering sign-off for the Bronco II is scheduled for 7/9/82. Minimal development DVP&R[7] testing has been completed because the suspension and steering system designs have not been finalized for improved roll characteristics during the "J" turn maneuver.

A decision is required to solidify the steering and suspension designs. Development recommends pursuing items 1, 2, and 3 below if a *small* improvement in roll characteristics during a "J" turn maneuver is deemed acceptable, or pursuing item 4 below if a *major* improvement is required.

---

7. This acronym stands for Design Verification Plan and Report. In general terms, it is a type of testing to verify the product works as designed.

Incorporation of item 4 would most likely cause a delay in Job # 1 [the release date of the Bronco II].

(emphasis in original). Dr. Richardson testified that to his knowledge none of the recommendations set out in the document were adopted.

Dr. Richardson testified to a Ford document dated May 4, 1982. The document identified the current stability index of the Bronco II at 2.03. Dr. Richardson noted that any change to the Bronco II after the date of this document "had to be very small if [Ford] w[as] going to still put [the Bronco II] on the market in the beginning of [1983]." He went on to testify that in the state the Bronco II was then in, with a stability index of 2.03 the vehicle would be "dangerously unstable."

Branham introduced a Ford document from September 14, 1982, with the following stated purpose: "To identify advanced engineering projects that will be undertaken to provide for continued improvement, Bronco II handling, during its cycle life." Dr. Richardson responded to the document as follows:

The vehicle should have been made reasonably safe when it was first designed and built. There was time to do that, the discussions in the engineering documents, to me as an engineer, show me that the engineers knew how to do that, could have done it, and that should have been done. To release it without it being reasonably safe then subjects those people who buy it to risk. Now, if it is released in that configuration, it certainly should be improved as time goes along because it shouldn't be left that way.

Following up on his expert's opinion, Branham asked whether improvements were ever made to correct the problems in the Bronco II when it was released. Dr. Richardson responded, "there were no improvements made that would correct this defect."

The rollover propensity in the Bronco II 4x4, as reflected in the stability index and elevated center of gravity, was increased in the Bronco II 4x2. The two-wheel drive Bronco was lighter than its four-wheel version, resulting in reduced stability and an even higher center of gravity. The Bronco II involved in this litigation is a 4x2.

The foregoing is not an exhaustive review of the evidence presented by Branham, but it serves to support the able trial

judge's determination that Branham presented sufficient evidence of a design defect known to Ford at or prior to the date of manufacture to withstand a directed verdict motion. We make this determination without having to rely on the further body of evidence of the Bronco II's rollover tendencies found in the substantial post-distribution evidence which the trial court allowed.[8]

C.

We next address Ford's two-fold argument that: (1) Branham failed to prove a reasonable alternative design pursuant to the risk-utility test; and (2) South Carolina law requires a risk-utility test in design defect cases to the exclusion of the consumer expectations test.

■ For a plaintiff to successfully advance a design defect claim, he must show that the design of the product caused it to be "unreasonably dangerous." *Madden v. Cox*, 284 S.C. 574, 579–80, 328 S.E.2d 108, 112 (Ct.App.1985). In South Carolina, we have traditionally employed two tests to determine whether a product was unreasonably dangerous as a result of a design defect: (1) the consumer expectations test and (2) the risk-utility test.

In *Claytor v. General Motors Corp.*, this Court phrased the consumer expectations test as follows: "The test of whether a product is or is not defective is whether the product is unreasonably dangerous to the consumer or user given the conditions and circumstances that foreseeably attend use of the product." 277 S.C. 259, 262, 286 S.E.2d 129, 131 (1982).

The *Claytor* Court articulated the risk-utility test in the following manner: "[N]umerous factors must be considered [when determining whether a product is unreasonably dangerous], including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger." *Id.* at 265, 286 S.E.2d at 132.

Later, in *Bragg v. Hi–Ranger, Inc.*, our court of appeals phrased the risk-utility test as follows: "[A] product is unreasonably dangerous and defective if the danger associated with

_____

8. We discuss this issue in detail in Part III.A, *infra*.

the use of the product outweighs the utility of the product." 319 S.C. 531, 543, 462 S.E.2d 321, 328 (Ct.App.1995). The *Bragg* court went on to list the above factors set forth in *Claytor* as the relevant inquiry when weighing the danger of the product versus its utility. *Id.* at 543–44, 462 S.E.2d at 328.

Ford contends Branham failed to present evidence of a feasible alternative design. Implicit in Ford's argument is the contention that a product may only be shown to be defective and unreasonably dangerous by way of a risk-utility test, for by its very nature, the risk-utility test requires a showing of a reasonable alternative design.[9] Branham counters, arguing that under *Claytor* he may prove a design defect by resort to the consumer expectations test or the risk-utility test. Branham also argues that regardless of which test is required, he has met both, including evidence of a feasible alternative design. We agree with Branham's contention that he produced evidence of a feasible alternative design. Branham additionally points out that the jury was charged on the consumer expectations test *and* the risk-utility test.

■ As discussed above, Branham challenged the design of the Ford Bronco II by pointing to the MacPherson suspension as a reasonable alternative design. A former Ford vice president, Thomas Feaheny, testified that the MacPherson suspension system would have significantly increased the handling and stability of the Bronco II, making it less prone to rollovers. Branham's expert, Dr. Richardson, also noted that the MacPherson suspension system would have enhanced vehicle stability by lowering the vehicle center of gravity. There was further evidence that the desired sport utility features of the Bronco II would not have been compromised by using the MacPherson suspension. Moreover, there is evidence that use of the MacPherson suspension would not have increased costs. Whether this evidence satisfies the risk-utility test is ultimately a jury question. But it is evidence of a feasible alternative design, sufficient to survive a directed verdict motion.

9. One commentator has noted that, "one simply cannot talk meaningfully about a risk-[utility] defect in a product design until and unless one has identified some design alternative (including any design omission) that can serve as the basis for a risk-[utility] analysis." Gary T. Schwartz, *Foreword: Understanding Products Liability,* 67 Cal.L.Rev. 435, 468 (1979).

■ While the consumer expectations test fits well in manufacturing defect cases, we do agree with Ford that the test is ill-suited in design defect cases. We hold today that the exclusive test in a products liability design case is the risk-utility test with its requirement of showing a feasible alternative design. In doing so, we recognize our Legislature's presence in the area of strict liability for products liability.

In 1974, our Legislature adopted the *Restatement (Second) of Torts* § 402A (1965), and identified its comments as legislative intent. S.C.Code Ann. §§ 15–73–10–30 (2005). The comments in section 402A are pointed to as the basis for the consumer expectations test.[10] Since the adoption of section 402A, the American Law Institute published the *Restatement (Third) of Torts: Products Liability* (1998). The third edition effectively moved away from the consumer expectations test for design defects, and towards a risk-utility test. We believe the Legislature's foresight in looking to the American Law Institute for guidance in this area is instructive.

The Legislature has expressed no intention to foreclose court consideration of developments in products liability law. For example, this Court's approval of the risk-utility test in *Claytor* yielded no legislative response. We thus believe the adoption of the risk-utility test in design defect cases in no manner infringes on the Legislature's presence in this area.

Some form of a risk-utility test is employed by an overwhelming majority of the jurisdictions in this country.[11] Some

10. *E.g., Young v. Tide Craft, Inc.,* 270 S.C. 453, 471, 242 S.E.2d 671, 680 (1978) (quoting from comment i. to express the consumer expectations test); *see also* Jerry J. Philips, *Consumer Expectations,* 53 S.C.L.Rev. 1047, 1047 (2002) (noting that comments g. & i. form the consumer expectations test).

11. By our count 35 of the 46 states that recognize strict products liability utilize some form of risk-utility analysis in their approach to determine whether a product is defectively designed. Four states do not recognize strict liability claims at all. Those four states are Delaware, Massachusetts, North Carolina, and Virginia. *Cline v. Prowler Indus. of Md., Inc.,* 418 A.2d 968, 980 (Del.1980); *Back v. Wickes Corp.,* 375 Mass. 633, 378 N.E.2d 964, 968–69 (1978); *Smith v. Fiber Controls Corp.,* 300 N.C. 669, 268 S.E.2d 504, 509–10 (1980); *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 57 n. 4 (1988). Another state, Missouri, rejects altogether any test in the form of a jury charge to determine whether a product is unreasonably

of these jurisdictions exclusively employ a risk-utility test,[12] while others do so with a hybrid of the risk-utility and the consumer expectations test, or an explicit either-or option.[13] States that exclusively employ the consumer expectations test

dangerous, leaving that determination instead to the "collective intelligence and experience" of the jury. *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 64–65 (Mo.1999) (quoting *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 154 (Mo.1998)).

**12.** *Gen. Motors Corp. v. Jernigan*, 883 So.2d 646, 662–63 (Ala.2003); *Armentrout v. FMC Corp.*, 842 P.2d 175, 183–84 (Colo.1992); *Banks v. ICI Ams., Inc.*, 264 Ga. 732, 450 S.E.2d 671, 674–75 (1994); *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002); *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky.2004); *Jenkins v. Int'l Paper Co.*, 945 So.2d 144, 150–51 (La.Ct.App.2006); *St. Germain v. Husqvarna Corp.*, 544 A.2d 1283, 1285–86 (Me.1988); *Gregory v. Cincinnati Inc.*, 450 Mich. 1, 538 N.W.2d 325, 329–30 (1995); *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96–97 (Minn.1987); *Williams v. Bennett*, 921 So.2d 1269, 1273–75 (Miss.2006); *Rix v. Gen. Motors Corp.*, 222 Mont. 318, 723 P.2d 195, 201–02 (1986); *Cavanaugh v. Skil Corp.*, 164 N.J. 1, 751 A.2d 518, 522 (2000); *Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 902 P.2d 54, 61–62 (1995); *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730, 735–36 (N.Y.1995); *Azzarello v. Black Bros. Co.*, 480 Pa. 547, 391 A.2d 1020, 1026–27 (1978); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 335 (Tex.1998); *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666, 682–84 (1979).

**13.** *Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1220 (Alaska 1998); *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 709 P.2d 876, 879–80 (1985); *Lee v. Martin*, 74 Ark. App. 193, 45 S.W.3d 860, 864 (2001); *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 110 Cal.Rptr.2d 370, 28 P.3d 116, 125 (2001); *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 694 A.2d 1319, 1333–34 (1997); *Liggett Group, Inc. v. Davis*, 973 So.2d 467, 475–76 (Fla.Dist.Ct.App.2007); *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 944 P.2d 1279, 1311 (1997); *Mikolajczyk v. Ford Motor Co.*, 231 Ill.2d 516, 327 Ill.Dec. 1, 901 N.E.2d 329, 352 (2008); *Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 792 A.2d 1145, 1152–54 (2002); *Kelleher v. Marvin Lumber & Cedar Co.*, 152 N.H. 813, 891 A.2d 477, 492 (2005); *Endresen v. Scheels Hardware & Sports Shop, Inc.*, 560 N.W.2d 225, 233–34 (N.D.1997); *Perkins v. Wilkinson Sword, Inc.*, 83 Ohio St.3d 507, 700 N.E.2d 1247, 1248–49 (1998); *McCathern v. Toyota Motor Corp.*, 332 Or. 59, 23 P.3d 320, 331–32 (2001); *First Premier Bank v. Kolcraft Enters., Inc.*, 686 N.W.2d 430, 444–45 (S.D.2004), *superseded by rule change on unrelated grounds* 2006 S.D. Sess. Laws Ch. 341 *as recognized in In re Estate of Duebendorfer*, 721 N.W.2d 438, 444 (S.D. 2006); *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527, 533 (Tenn. 1996); *Dimick v. OHC Liquidation Trust*, 157 P.3d 347, 349–50 (Utah Ct.App.2007); *Soproni v. Polygon Apartment Partners*, 137 Wash.2d 319, 971 P.2d 500, 505 (1999).

are a decided minority.[14]

We believe that in design defect cases the risk-utility test provides the best means for analyzing whether a product is designed defectively. Unlike the consumer expectations test, the focus of a risk-utility test centers upon the alleged defectively designed product. The risk-utility test provides objective factors for a trier of fact to analyze when presented with a challenge to a manufacturer's design. Conversely, we find the consumer expectations test and its focus on the consumer ill-suited to determine whether a product's design is unreasonably dangerous.[15]

We believe the rule we announce today in design defect cases adheres to the approach the trial and appellate courts in this state have been following. In reported design defect cases, our trial and appellate courts have placed their imprimatur on the importance of showing a feasible alternative design. *See Claytor v. Gen. Motors Corp.*, 277 S.C. 259, 265, 286 S.E.2d 129, 132 (1982) (adopting the risk-utility test); *Kennedy v. Custom Ice Equip. Co.*, 271 S.C. 171, 176, 246 S.E.2d 176, 178 (1978) (affirming verdict in favor of plaintiff by noting that plaintiff presented evidence of a design alternative); *Mickle v. Blackmon*, 252 S.C. 202, 234–35, 166 S.E.2d 173, 187–88 (1969) (discussing a manufacturer's decision to use

---

**14.** *Rojas v. Lindsay Mfg. Co.*, 108 Idaho 590, 701 P.2d 210, 211–12 (Idaho 1985) *but see Puckett v. Oakfabco, Inc.*, 132 Idaho 816, 979 P.2d 1174, 1181 (1999) (noting absence of reasonable alternative design as a basis for affirming summary judgment); *Baker v. Heye–Am.*, 799 N.E.2d 1135, 1140 (Ind.Ct.App.2003); *Delaney v. Deere & Co.*, 268 Kan. 769, 999 P.2d 930, 946 (2000); *Rahmig v. Mosley Mach. Co.*, 226 Neb. 423, 412 N.W.2d 56, 81–82 (1987); *Stackiewicz v. Nissan Motor Corp. in U.S.A.*, 100 Nev. 443, 686 P.2d 925, 928 (1984) *but see McCourt v. J.C. Penney Co., Inc.*, 103 Nev. 101, 734 P.2d 696, 697–98 (1987) (recognizing alternative design is a factor for determining whether a product is unreasonably dangerous); *Woods v. Fruehauf Trailer Corp.*, 765 P.2d 770, 774 (Okla.1988); *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 779 (R.I.1988) but *see Buonanno v. Colmar Belting Co.*, 733 A.2d 712, 718 (R.I.1999) (discussing relevancy of alternative design in context of whether a product is defectively designed); *Farnham v. Bombardier, Inc.*, 161 Vt. 619, 640 A.2d 47, 48 (1994); *Green v. Smith & Nephew AHP, Inc.*, 245 Wis.2d 772, 629 N.W.2d 727, 739–41 (2001); *Sims v. Gen. Motors Corp.*, 751 P.2d 357, 364–65 (Wyo.1988).

**15.** The consumer expectations test is best suited for a manufacturing defect claim.

one type of inferior material as a component part one year, but a superior material the following year—that is, a design alternative); *Bragg v. Hi–Ranger, Inc.,* 319 S.C. 531, 546, 462 S.E.2d 321, 330 (Ct.App.1995) (affirming defense verdict and noting that plaintiff failed to present evidence of a feasible alternative design); *Sunvillas Homeowners Ass'n v. Square D Co.,* 301 S.C. 330, 334, 391 S.E.2d 868, 870 (Ct.App.1990) (affirming a defense directed verdict and noting that plaintiff's expert failed to discuss design alternatives); *Gasque v. Heublein, Inc.,* 281 S.C. 278, 283, 315 S.E.2d 556, 559 (Ct.App. 1984) (affirming a plaintiff's verdict and noting in detail existence of alternative design evidence).

In *Kennedy v. Custom Ice Equipment Co.,* this Court specifically pointed to evidence that the challenged industrial ice machine would have been safer had the manufacturer installed a protective cover. 271 S.C. at 176, 246 S.E.2d at 178. In *Gasque v. Heublein, Inc.,* our court of appeals acknowledged the importance of a reasonable alternative design in a product liability design defect case wherein it noted evidence of alternative designs in an opinion affirming an award for the plaintiff. 281 S.C. at 283, 315 S.E.2d at 559. In like manner is the case of *Sunvillas Homeowners Ass'n v. Square D Co.,* where the court of appeals upheld a directed verdict in favor of a manufacturer, noting that plaintiffs did not produce any evidence of design alternatives. 301 S.C. at 334, 391 S.E.2d at 870. And more recently, in *Bragg,* our court of appeals again noted the absence of alternative design evidence in affirming a defense verdict. 319 S.C. at 546, 462 S.E.2d at 330. The very nature of feasible alternative design evidence entails the manufacturer's decision to employ one design over another. This weighing of costs and benefits attendant to that decision is the essence of the risk-utility test.

This approach is in accord with the current edition of the Restatement of Torts:

A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b)
(1998). Concerning the framework for the risk-utility test, we
agree with Professor David G. Owen, who observed:

[T]he basic liability test should be congruent with the basic
issue that in most cases must be proved. In design defect
litigation, that basic issue involves the following fundamen-
tal ... question: whether the manufacturer's failure to
adopt a particular design feature proposed by the plaintiff
was, on balance, right or wrong. A congruence between
this central issue and the liability test requires that the test
focus squarely on the issue of what, in particular, allegedly
was wrong with the manufacturer's design decision. More
specifically, this inquiry asks whether the increased costs
(lost dollars, lost utility, and lost safety) of altering the
design—in the particular manner the plaintiff claims was
reasonably necessary to the product's safety—would have
been worth the resulting safety benefits.

David G. Owen, *Toward a Proper Test for Design Defective-
ness: "Micro–Balancing" Costs and Benefits*, 75 TEX.L.REV.
1661, 1687 (1997).

■ In every design defect case the central recurring fact
will be a product that failed causing damage to a person or his
property. Consequently, the focus will be whether the prod-
uct was made safe enough. This inquiry is the core of the
risk-utility balancing test in design defect cases, yet we do not
suggest a jury question is created merely because a product
can be made safer. We adhere to our longstanding approval
of the principle that a product is not in a defective condition
unreasonably dangerous merely because it "can be made more
safe." As we observed in *Marchant v. Mitchell Distributing
Co.*:

Most any product can be made more safe. Automobiles
would be more safe with disc brakes and steel-belted radial
tires than with ordinary brakes and ordinary tires, but this
does not mean that an automobile dealer would be held to
have sold a defective product merely because the most safe
equipment is not installed. By a like token, a bicycle is
more safe if equipped with lights and a bell, but the fact
that one is not so equipped does not create the inference
that the bicycle is defective and unreasonably dangerous.

. . . .

There is, of course, some danger incident to the use of any product.

270 S.C. 29, 35–36, 36, 240 S.E.2d 511, 513, 514 (1977).

█ In sum, in a product liability design defect action, the plaintiff must present evidence of a reasonable alternative design. The plaintiff will be required to point to a design flaw in the product and show how his alternative design would have prevented the product from being unreasonably dangerous. This presentation of an alternative design must include consideration of the costs, safety and functionality associated with the alternative design.[16] On retrial, Branham's design defect claim will proceed pursuant to the risk-utility test and not the consumer expectations test.

### III.

Notwithstanding the existence of ample evidence to withstand a directed verdict motion on the handling and stability design defect claim, we reverse and remand for a new trial. There are three reasons we reverse and remand the finding of liability and award of actual damages. First, this case implicates two evidentiary rules related to products liability cases. The first rule provides that whether a product is defective must be measured against information known at the time the product was placed into the stream of commerce. When a claim is asserted against a manufacturer, post-manufacture evidence is generally not admissible. The second rule provides that evidence of similar incidents is admissible where there is a substantial similarity between the other incidents and the accident in dispute tending to prove or disprove some fact in controversy. Evidence was introduced that violated both of these rules. Third, Branham's closing argument was a

---

16. The analysis asks the trier of fact to determine whether the potential increased price of the product (if any), the potential decrease in the functioning (or utility) of the product (if any), and the potential increase in other safety concerns (if any) associated with the proffered alternative design are worth the benefits that will inhere in the proposed alternative design. *Claytor*, 277 S.C. at 265, 286 S.E.2d at 132 (recognizing that any product "can be made more safe" and that "numerous factors must be considered, including the usefulness and desirability of the product [and] the cost involved for added safety").

direct appeal to the passion and prejudice of the jury. And although not a standalone ground for reversal, we find that because Ford and Hale were joint tortfeasors, it was error to require the jury to apportion responsibility between the defendants.

## A.

### *Post-distribution evidence*

■ In order for a plaintiff to prove his case in a product liability action, he must show that the "product was in a defective condition at the time that it left the hands of the particular seller ... and unless evidence can be produced which will support the conclusion that it was *then* defective, the burden is not sustained." *Claytor v. Gen. Motors Corp.*, 277 S.C. 259, 264, 286 S.E.2d 129, 131–32 (1982) (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 402A, cmt. g. (1965) adopted as legislative intent via S.C.Code Ann. § 15–73–30 (2005)); *see also Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 548–49, 462 S.E.2d 321, 331 (Ct.App.1995) (recognizing that the "product must be 'measured against a standard existing at the time of sale' " and that " 'hindsight opinions by [. . .] experts suggesting that more should have been done ... are insufficient to discredit the conclusion that the manufacturer met the standard of care' ") (quoting *Sexton ex rel. Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 337 (4th Cir.1991) and *Doe v. Miles Labs., Inc., Cutter Labs. Div.*, 927 F.2d 187, 193 (4th Cir.1991)); RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. a. (1998) ("[F]or the liability system to be fair and efficient, the balancing of risks and benefits in judging product design ... must be done in light of the knowledge of risks and risk-avoidance techniques reasonably attainable at the time of distribution."). Because the claim here is against the manufacturer, the "time of distribution" is the time of manufacture.

■ While we find Branham presented sufficient evidence to create a jury question on his design defect claim, we further find Ford was prejudiced by Branham's unrelenting pursuit of post-distribution evidence on the issue of liability. Given the extent of the improper post-distribution evidence introduced, the error cannot be considered harmless.

 We first clarify what is post-distribution evidence. Simply defined, post-distribution evidence is evidence of facts neither known nor available at the time of distribution. When assessing liability in a design defect claim against a manufacturer, the judgment and ultimate decision of the manufacturer must be evaluated based on what was known or "reasonably attainable" at the time of manufacture.[17] *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. a. (1998). The use of post-distribution evidence to evaluate a product's design through the lens of hindsight is improper. *See Gregory v. Cincinnati, Inc.*, 450 Mich. 1, 538 N.W.2d 325, 326 (1995) ("Evidence of conduct after the date of manufacture improperly shifts the focus from the premanufacturing decision and has the potential to taint any finding of liability.").

Hale's Ford Bronco II 4x2 was manufactured in 1986. The following is a sampling of the post-manufacture (or post-distribution) evidence.

Branham introduced a memorandum dated April 14, 1989, dealing with a meeting that three Ford engineers had with "six people from Consumers Report." The memorandum stated that:

> Our objective was to "give it our best shot" at diffusing a very negative story on the Bronco II in the June issue.... The magazine has done a comparative test of the Chevy S-10 Blazer, Geo Tracker, Dodge Raider and Bronco II. As the result of several calls from a Consumer Report writer, we were led to believe that the story could be nearly as negative as last summer's Suzuki Samurai story. Plus, NHTSA is currently conducting an engineering analysis of the Bronco II which creates a negative cloud. And, FARS [Fatal Analysis Reporting System] data shows Bronco II to

---

**17.** The dissent asserts that our opinion "may be read as barring any evidence created after the date of manufacture." We do not intend our holding to reach that far. As defined above, post-distribution evidence is "evidence of facts neither known *nor available* at the time of distribution." THE RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. a speaks in terms of "reasonably attainable" knowledge at the time of distribution. If information on a product is reasonably attainable, then a manufacturer is charged with such knowledge at the time of manufacture. The rule prohibiting the introduction of post-distribution evidence does not permit a manufacturer to turn a blind eye to reasonably available information regarding the safety or danger of its product.

have a higher fatal rollover rate relative to certain competitors.

The memorandum went on to note the following: "Our data are not terribly favorable. Our rollover rate is three times higher than the Chevy S–10 Blazer." This evidence of the Bronco II's rollover rate is post-manufacture evidence.

Later in the same 1989 memorandum, as the engineers discuss how they thought they did, this comment is made: "We think, however, that we have clouded their minds, loosened some conclusions they may have reached prior to our meeting and sent them off to search for additional information that could work to our advantage." The "clouded their mind" comment became a mantra for Branham on the issue of liability and otherwise.

Through Branham's expert, Dr. Richardson, a 1989 film was introduced. Counsel emphasized this film, taped in 1989, comparing the S–10 Blazer and the Bronco II. As reflected in Plaintiff's exhibit 54A, which is the corresponding report to the videotape, Ford requested "additional 'J' turn tests" on May 17, 1989 for various vehicles, including a 1989 Bronco II 4x4. The tape (post-manufacture evidence) revealed that the 1989 Bronco II did not handle as well as the S–10 Blazer.

Dr. Richardson also testified to a document, Plaintiff's exhibit 168, referencing post-manufacture evidence that compared a 1989 Bronco II (referred to in the document as BII) to the UN46 prototype, now known as the Ford Explorer. This exhibit shows the additional evidence of the rollover tendency of the Bronco II that came to light after 1986:

Current "strategies" for development of utility vehicle stability have changed over the past few years due (sic) the increased availability of rollover accident data and analyses. Previous strategies were partially driven by the Insurance Institute tests of the Jeep CJ7 in the early 80's which emphasized risk from rollovers caused by extreme (rate and magnitude) steering inputs in emergency maneuvers. Independent DOT, GM and Ford studies have confirmed that rollovers directly induced by extreme steering inputs are rare for any Utility vehicle (including the CJ7). The following quote from GM's recent SAE Paper (Reconstruction of Rollover Collisions, SAE 890857) summarizes current wis-

dom. "A common pre-rollover maneuver is an off-road path by the car, followed by heavy steer correction back towards the road leading to a side slide, and, ultimately, a trip followed by the rollover." Based on this new information, the UN46 was developed using a handling philosophy notably different from the BII.[18]

This post-distribution exhibit concludes:

Based on an analysis of FARS accident summaries and BII & Competitive handling characteristics, it is impossible to identify any type of vehicle "defect" that could explain the BII FARS performance. It is most likely that the handling strategy used during the development of the BII, which fully exploited the vehicles (sic) inherent quickness (due to its short wheelbase), encourages aggressive driving and makes the vehicle more sensitive to the large steering wheel "over-corrections" that seem to be part of most rollover scenarios. This sensitivity is aggravated by the fact the (sic) most operators in rollover accidents are either inexperienced drivers, under the influence of alcohol or both. The UN46, designed with the benefit of the FARS experience for all utility vehicles, has been intentionally developed to resolve these issues.

Yet another example of post-distribution evidence is found in a March 3, 1989 memorandum addressing an accident caused while testing a prototype anti-lock braking system (ABS) at the Dearborn Proving Grounds (DPG). The memorandum revealed that on February 28, 1989, a "demonstration was conducted on an ice pad located on the DPG East–West runway" and that the "accident involved a Kelly–Wayes Company owned 1989 Bronco II with prototype ABS." The goal was to test the efficacy of the ABS system when running partially on ice and partially on dry ground. During the test procedure the Bronco II rolled over. The rollover occurred on ice.

■■■ There are other examples of post-manufacture evidence, but the few examples cited illustrate the inherent prejudice that flows from post-distribution evidence. It is

---

**18.** Plaintiff's exhibit 168 refers to General Motors' "recent" Society of Automotive Engineers (SAE) paper concerning rollovers. The GM SAE paper was published in February of 1989.

good when a manufacturer continues to test and evaluate its product after initial manufacture. As additional information is learned, changes may be made that improve product safety and function. As a matter of policy, the law should encourage the design and manufacture of safe, functional products. In holding manufacturers accountable for unreasonably dangerous products pursuant to a fair system, products liability law serves that goal. Moreover, the law should encourage manufacturers to continue to improve their products in terms of utility and safety free from prior design decisions judged through the lens of hindsight.

Whether the 1987 Ford Bronco II was defectively designed and in a defective condition unreasonably dangerous must be determined as of the 1986 manufacture date of the vehicle. Ford's 1986 design and manufacture decision should be assessed on the evidence available at that time, not the increased evidence of additional rollover data that came to light after 1986.

### B.

#### *Other Similar Incidents*

 In *Whaley v. CSX Transportation Inc.*, this Court recognized that similar accidents are admissible if they "tend[ ] to prove or disprove some fact in dispute." 362 S.C. 456, 483, 609 S.E.2d 286, 300 (2005). The Court also recognized that this type of evidence has the potential to be "highly prejudicial." [19] *Id.* at 483, 609 S.E.2d at 300. Accordingly, it set forth a stringent standard for admissibility: " '[A] plaintiff must present a factual foundation for the court to determine that the other accidents were substantially similar to the accident at issue.' " *Id.* at 483, 609 S.E.2d at 300 (quoting *Buckman v. Bombardier Corp.*, 893 F.Supp. 547, 552 (E.D.N.C.1995)); *see also Atkinson v. Orkin Exterminating Co.*, 361 S.C. 156, 604 S.E.2d 385 (2004) (recognizing that "unless Orkin's past conduct is 'similar' to the conduct directed at the [plaintiffs], it is inadmissible").

---

19. In *Nissan Motor Co. v. Armstrong,* the Texas Supreme Court made a similar observation, noting that: "[P]rolonged proof of what happened in other accidents cannot be used to distract a jury's attention from what happened in the case at hand." 145 S.W.3d 131, 138 (Tex.2004).

Before addressing the "substantially similar" test, we resolve Ford's twin challenge to the post-manufacture evidence of supposed similar incidents. Even assuming a plaintiff satisfies the *Whaley* "substantially similar" test, such evidence must not run afoul of the rule in products liability cases that prohibits post-distribution evidence to establish liability. *Whaley* is instructive in this regard.

Whaley was employed by CSX Transportation. Whaley became ill, allegedly due to work conditions, with heat-related symptoms first reported on May 24, 2000. Whaley introduced evidence that "between 1984 and 2000, CSX had received ninety-seven employee complaints about heat. In addition, the trial judge permitted Whaley to introduce evidence that, between 1993 and 2000, eighteen CSX employees had suffered heat stroke." *Whaley*, 362 S.C. at 483, 609 S.E.2d at 300. Because "Whaley did not establish that the reported complaints and injuries stemmed from the same or similar circumstances as his injuries[,]" it was error to admit the evidence. *Id.* at 483–84, 609 S.E.2d at 300. Yet Whaley never attempted to introduce evidence of other incidents that occurred after the 2000 injury date.

On the issue of liability, Branham presented voluminous evidence of post-manufacture rollover data. The post-manufacture evidence of purported similar incidents was error, even if the "substantially similar" threshold was met.[20] Post-manufacture evidence of similar incidents is not admissible to prove liability.

This Court recently revisited *Whaley* in a products liability setting, *Watson v. Ford Motor Co.*, 389 S.C. 434, 699 S.E.2d 169 (2010) (Shearouse Adv. Sh. No. 10 at 37). In *Watson*, we repeated that "[e]vidence of similar accidents, transactions, or happenings is admissible in South Carolina where there is

---

**20.** Branham's evidence concerning the February 28, 1989 rollover, discussed above in Part III.A., is an example of evidence that violates both rules. First, it is post-manufacture evidence. Second, the purpose was to test a prototype braking system (the anti-lock braking system) on ice. According to Plaintiff's exhibit 275, "[s]everal brake application maneuvers were performed on the ice surface." The 1989 Bronco rolled over during the testing. A rollover under these circumstances is so patently dissimilar to the circumstances of Hale's June 17, 2001 accident that no discussion is warranted.

some special relation between the accidents tending to prove or disprove some fact in dispute." *Id.* at 50. In imposing a burden on plaintiffs to demonstrate "that the other accidents were substantially similar to the accident at issue[,]" the Court "set forth factors to support a claim that the present accident was caused by the same defect: (1) the products are similar; (2) the alleged defect is similar; (3) causation related to the defect in the other incidents; and (4) exclusion of all reasonable secondary explanations for the cause of the other accidents." *Id.* at 51 (citing *Buckman v. Bombardier*, 893 F.Supp. at 552).

We turn now to the evidence of pre-manufacture rollover data. Branham introduced evidence of rollover accidents involving the Bronco II and other vehicles in the same class that was known at or prior to the 1986 manufacture of Hale's Bronco II. Ford claims the pre-manufacture comparative evidence of rollover accidents violates the *Whaley–Watson* "substantially similar" test because there was no showing that the cause of the other accidents was similar to the cause of the rollover accident at issue.

In commenting on this evidentiary dispute, we must be careful not to foreclose the discretion of the trial court in ruling on objections during the course of the retrial. This is especially true with "other similar incidents" evidence because of its potential to be "highly prejudicial," thereby implicating Rule 403, SCRE. Our discussion, therefore, is intended as a general guideline, as we recognize a host of factors can arise during the course of a trial that impact a trial court's decision to admit or exclude evidence.

With that caveat, on the record before us, we disagree with Ford. Admittedly, a showing of comparative rollover accident rates does not establish the manner in which any particular accident occurred. But Ford misconstrues the essence of Branham's design defect claim. To the extent Branham is able to establish (at or prior to the manufacture date of the subject vehicle) the rate or number of rollover accidents of the Bronco II was greater as compared to other vehicles in its class, such evidence may well be relevant on whether the Bronco II was unreasonably dangerous.

We do agree with Ford that if the cause of an accident is known and the cause is not substantially similar to the accident at issue, evidence of the other accident should be excluded. Yet, where the precise cause of an accident is not known, Bronco II rollover accident data has relevance when compared to rollover accident data of other vehicles in class. This relevance is linked directly to Branham's claim that the design of the Bronco II caused it to have an unreasonably dangerous tendency to rollover.

Like the trial court, we are persuaded by neither Ford's general argument that many accidents may be attributable to inexperienced or impaired drivers, nor its specific reference to Hale's inattention as the cause of the June 17, 2001 accident.

First, as referenced in a Ford document (Plaintiff's exhibit 168), Ford recognized the tendency of the Bronco II to roll over, describing it as driving "sensitivity" which is "aggravated by the fact [that] most operators in rollover accidents are either inexperienced drivers, under the influence of alcohol or both." Assuming a number of rollover accidents are caused by inexperienced or impaired drivers, there is no suggestion in this record that inexperienced or impaired drivers disproportionately favored the Bronco II, thus skewing the comparative rollover accident data. It is inferable that rollover accidents caused by inexperienced or impaired drivers are shared by all vehicles in the class, not just the Bronco II. While Ford's position may have appeal as a jury argument, it is of little moment on the admissibility question in the record before us.

Second, there may be little or no doubt as to Hale's negligence, but that misses the point in terms of the admissibility of comparative rollover accident data. A car manufacturer must design and produce vehicles that are not in a defective condition unreasonably dangerous to the user. Cars are designed with utility and safety in mind, and careless driving is a foreseeable reality. The general nature of the alleged negligent driving on the part of Hale was (or should have been) part of the evaluative process that culminated in the ultimate decision of Ford to design, manufacture and market the Bronco II to the driving public. Ford had a duty to design and manufacture the Bronco II as a reasonably safe vehicle.

We believe our consideration of the admissibility of the pre-manufacture rollover accident data necessarily flows from the risk-utility test for products liability design defect cases.

## C.

### Closing Argument

It is improper for counsel to make a "closing argument to the jury ... calculated to arouse passion or prejudice." *Gathers v. Harris Teeter Supermarket, Inc.,* 282 S.C. 220, 231, 317 S.E.2d 748, 755 (Ct.App.1984). The closing argument of Branham's counsel was designed to inflame and prejudice the jury. Closing argument excerpts include:

1. "This is how Ford looks at this. That little bit of thirty people being killed every year didn't matter. Those thirty people, those thirty extra people getting killed in a year didn't matter to them because it was just a little bitty number."

2. "It does matter about those people getting killed. Those thirty people do count. Those thirty people— that's thirty more people that got killed that year. If you expect these vehicles to last about twenty years, that's six hundred more people getting killed using this vehicle as opposed to a Chevy S–10 Blazer. That's serious."

3. "And that doesn't count the paralyzed people, the quadriplegics, the people with serious injuries, the thousands of people that have been in these events because of this rollover propensity of this vehicle that they knew about, and they knew it since day one but they chose profit over safety every time because they looked at it as numbers. They didn't look at it as lives, as people."

4. "I submit to you that the evidence is that they did it because they thought it was a little, small number.... [T]hey did not look at it as thirty lives a year[ ], they didn't look at it as six hundred lives. That's how they should have looked at it, but that was not how they did it."

5. "They got together at the highest levels of Ford Motor Company and they made a judgment that rather than

delaying and improving the Bronco II, they were going to sell the vehicle as it was and that they were going to risk people's lives and they were going to risk serious injuries like we have here today. They were going to risk people's brains."

6. "Jesse Branham is here today with a brain injury and six hundred other people, or however many it is, lost their lives, and numerous others have brain injuries or are paralyzed, quadriplegic, have extremely serious injuries. We believe that you should tell Ford Motor Company what you think about this kind of thing."

It is unmistakable that the closing argument relied heavily on inadmissible evidence. In addition, as will be discussed below, much of the prejudice resulting from the improper evidence was merged in closing argument with Branham's pursuit of punitive damages in requesting that the jury punish Ford for harm to Branham **and others.** The closing argument invited the jury to base its verdict on passion rather than reason. The closing argument denied Ford a fair trial. *Scoggins v. McClellion,* 321 S.C. 264, 269, 468 S.E.2d 12, 15 (Ct.App.1996) ("The test for granting a new trial on the basis of improper closing argument by opposing counsel is whether the complaining party was prejudiced to the extent that he or she was denied a fair trial.").

## D.

### The Verdict Form

▆▆ Over Ford's objection, the trial court required the jury to apportion liability between Ford and Hale. This was error. *S.C. Dep't of Transp. v. First Carolina Corp. of S.C.,* 372 S.C. 295, 303, 641 S.E.2d 903, 907–08 (2007) ("[A] special verdict question may be so defective in its formulation that its submission results in a prejudicial effect which constitutes reversible error."). Whether Ford was prejudiced by the improper verdict form is speculation, but we address the issue in light of the remand for a new trial.

Ford and Hale were alleged joint tortfeasors. The accident occurred in 2001. In 2001, multiple tortfeasors were jointly and severally responsible for all damages. Concerning a

plaintiff's ability to collect on a judgment, there could be no apportionment of fault among joint tortfeasors.[21] The trial court used a verdict form that is standard in comparative negligence cases where a defendant alleges the plaintiff's own negligence caused the accident and resulting injuries. Question five of the verdict form asked the following:

> Taking the combined negligence that proximately caused the parties' injuries as one hundred percent (100%), what percentage of that negligence is attributable to Defendant Ford Motor Company and what percentage is attributable to the Defendant Cheryl Jane Hale?

The jury apportioned fault 55% Ford and 45% Hale. Allocating fault between Ford and Hale served no legitimate purpose. Our comparative system for allocating liability between a plaintiff and a defendant is in no manner implicated where fault lies, if at all, among multiple defendants. Since the *Nelson v. Concrete Supply*[22] decision adopting comparative negligence (between a plaintiff and a defendant), this Court has reaffirmed the applicability of joint and several liability among joint tortfeasors. *Summer v. Carpenter,* 328 S.C. 36, 48, 492 S.E.2d 55, 61 (1997); *Am. Fed. Bank, FSB v. No. One Main Joint Venture,* 321 S.C. 169, 175–76, 467 S.E.2d 439, 443 (1996); *see also Fernanders v. Marks Constr. of S.C., Inc.,* 330 S.C. 470, 478, 499 S.E.2d 509, 513 (Ct.App.1998).

The trial court justified the apportionment question on the basis of a need to ensure that any punitive damage award was supported by a negligence cause of action, and not the strict liability claim. The trial court's reasoning is not persuasive. If there were genuine concern regarding the basis of a plain-

---

21. The cross-claim between Ford and Hale was severed from the underlying trial. The current version of the Contribution Among Tortfeasors Act became effective for cases arising after July 1, 2005. The 2005 amendment to the Act provides that a "less than fifty percent" at-fault defendant "shall only be liable for that percentage of the indivisible damages determined by the jury." S.C.Code Ann. § 15–38–15(A) (Supp.2008). A provision applicable in 2001 provided that "[i]n determining the pro rata shares of tortfeasors in the entire liability ... [,] their relative degrees of fault shall not be considered." S.C.Code Ann. § 15–38–30 (2005).

22. *Nelson v. Concrete Supply Co.,* 303 S.C. 243, 399 S.E.2d 783 (1991).

tiff's verdict, the easy solution was a verdict form tailored to that concern, just as Ford requested.

A detailed verdict form would have specified whether a finding of negligence against Ford was based on the seatbelt sleeve claim or the design defect claim, or both. A proper verdict form would have avoided the confusion caused by having the jury apportion blame between jointly and severally liable defendants. More to the point, Ford's requested special verdict form would have avoided the very real risk that the jury (unaware of joint and several liability principles) would take the cue from the apportionment question and inflate the actual damage award to ensure Branham received a full recovery from the one deep-pocket defendant. The actual damage award causes genuine concern as to the effect on the jury of the improper verdict form.

## IV.

Ford challenges the jury's award of $16,000,000 actual damages and $15,000,000 punitive damages. Because of our directive for a new trial, we decline to address Ford's contentions that these awards are excessive.

### A.

#### *Actual Damages*

Ford contends the $16,000,000 actual damage award is grossly excessive. "When a verdict is 'grossly excessive and the amount awarded is so shockingly disproportionate to the injuries as to indicate that the jury acted out of passion, caprice, prejudice, or other consideration not founded on the evidence, it becomes the duty of this Court, as well as the trial court, to set aside the verdict.'" *Sanders v. Prince,* 304 S.C. 236, 238, 403 S.E.2d 640, 642 (1991) (quoting *Small v. Springs Indus., Inc.,* 292 S.C. 481, 487, 357 S.E.2d 452, 455 (1987)). In light of the remand for a new trial, it is unnecessary to resolve Ford's claim that the actual damage award is grossly excessive.

### B.

#### *Punitive damages*

The issue of punitive damages was properly submitted to the jury. Ford, however, contends that the $15,000,000 puni-

tive damage award cannot withstand constitutional scrutiny. We agree. Because of the necessity of a new trial, we address two issues: Branham's reliance on "harm to others" and the evidence of compensation of Ford's executives.

The pervasive prejudice resulting from the improper post-manufacture evidence on the issue of liability was compounded in Branham's pursuit of punitive damages. Perhaps the manifestation of this error is most easily seen in counsel's request that the jury punish Ford for harming others beyond Branham. *See Durham v. Vinson*, 360 S.C. 639, 653, 602 S.E.2d 760, 767 (2004) (reversing an award of punitive damages because the trial court allowed the jury to "punish" the defendant for a "bad act unrelated" to the defendant's action toward the plaintiff); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 350, 353, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (reversing a punitive damages award where plaintiff's counsel asked the jury to "think about how many other Jesse Williams in the last 40 years in the State of Oregon there have been," and holding that "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation").

As outlined above, punishing Ford in this case for harming all Bronco II rollover victims was a central theme in counsel's closing argument.[23] The trial court charged the jury not to punish Ford for other "conduct." The charge violated the "harm to others" prohibition set forth in *Durham v. Vinson*

---

**23.** For example, "If you expect these vehicles to last about twenty years, that's six hundred more people getting killed using this vehicle as opposed to a Chevy S–10 Blazer. That's serious.... And that doesn't count the paralyzed people, the quadriplegics, the people with serious injuries, the thousands of people that have been in these events.... Jesse Branham is here today with a brain injury and six hundred other people, or however many it is, lost their lives, and numerous others have brain injuries or are paralyzed, quadriplegic, have extremely serious injuries. We believe you should tell Ford Motor Company what you think about this kind of thing." (Excerpts from Plaintiff's counsel's closing argument.) Ford has been told in other litigation that the Bronco II was defectively designed. *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539 (Ind.Ct.App.1999); *Ford Motor Co. v. Cammack*, 999 S.W.2d 1 (Tex.App.1998). Due process forbids punishing a tortfeasor multiple times for the same injury.

and *Philip Morris USA v. Williams.* By focusing on conduct, as opposed to harm to Branham, the charge invited the jury to punish Ford for all Bronco rollover deaths and injuries—the very harm *Durham* and *Philip Morris* forbid.

██ We next examine the admission of financial data regarding Ford. Unless the United States Supreme Court holds otherwise under the Due Process Clause, we adhere to South Carolina law that "the wealth of a defendant is a relevant factor in assessing punitive damages." *Welch v. Epstein,* 342 S.C. 279, 307, 536 S.E.2d 408, 423 (Ct.App.2000). This is frequently described as the "ability to pay" factor. But this factor is not without boundaries. "Punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Honda Motor Co. v. Oberg,* 512 U.S. 415, 432, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994); *see also State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 427, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("[R]eference to [the defendant's] assets ... ha[s] little to do with the actual harm sustained by the [plaintiff]. The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award.").

██ Branham presented evidence of Ford's net worth, income, revenues and cash flow. In 2005, Ford's net worth was $12,597,000,000. Also in 2005, Ford had $1,986,000,000 in income, $177,000,000,000 in revenue and $21,000,000,000 in cash flow. Branham extrapolated these figures to "per week," "per day," and "per hour." For example, concerning Ford's cash flow, "[t]hat's $416 Billion per week,[24] $59 Million per day, [and] $2.474 Million per hour."

This Court has approved the use of a defendant's net worth as a proper guide in assessing the "ability to pay" factor. *Hicks v. Herring,* 246 S.C. 429, 437, 144 S.E.2d 151, 154 (1965) (noting that "the wealth of a defendant is a relevant factor in

---

**24.** The $416 Billion per week figure is in the record, though the figure is clearly a miscalculation given annual cash flow of $21 Billion.

assessing punitive damages"). This Court has not, however, addressed the propriety of extrapolating financial data in the manner introduced at trial. Our court of appeals has directly addressed this issue and found no abuse of discretion in the admission of per day earnings of a defendant, *Orangeburg Sausage Co. v. Cincinnati Ins. Co.*, 316 S.C. 331, 344, 450 S.E.2d 66, 73–74 (Ct.App.1994), nor has it found an abuse of discretion in admitting the per day operating revenue or per day net income. *Bryant v. Waste Mgmt., Inc.*, 342 S.C. 159, 169–70, 536 S.E.2d 380, 385–86 (Ct.App.2000). These court of appeals decisions have not been tested since the 2003 Supreme Court opinion of *State Farm v. Campbell.*

Because the United States Supreme Court has discovered that a state court's punitive damages award implicates federal substantive due process, this Court is not the final arbiter of determining what financial evidence is proper in assessing punitive damages. Evidence concerning net worth appears the safest harbor. *Honda Motor* speaks directly to "net worth." 512 U.S. at 432, 114 S.Ct. 2331. Consideration of a defendant's net worth is well-rooted in the common law of punitive damages. *State Farm v. Campbell*'s cautionary observation that "reference to [the defendant's] assets ... ha[s] little to do with the actual harm sustained by the [plaintiff]" militates against venturing beyond net worth and extrapolations from net worth. *State Farm*, 538 U.S. at 427, 123 S.Ct. 1513. The retrial shall be confined to such evidence.

While the United States Supreme Court's foray into punitive damages law is, to be sure, confusing, there can be no serious doubt concerning financial evidence of the salaries and compensation of a defendant corporation's officers. Such evidence introduces an arbitrary factor in a jury's consideration and assessment of punitive damages.

 Branham went far beyond the pale in submitting evidence of Ford's senior management compensation, including the following: In 2005, the Ford Chairman and Chief Executive Officer was compensated by stock options worth $5,300,000; the Ford President and Chief Operating Officer received a salary $1,458,000 in 2005; the Ford Executive Vice President received a salary of $972,000 in 2005; the Ford Chief Financial Officer received a salary of $916,000 in 2005; a

former Ford chairman received $880,000 in 2005. Additional testimony revealed that "[i]n 2005, they didn't pay bonuses. In 2004, they did pay bonuses: $2 Million, $1 Million, $1 Million and $1 Million plus stock and other compensation. This gives you a picture of Ford Motor Company's financial condition." The admission of this evidence was error and highly prejudicial.

## V.

### Alignment of Parties

We reach Ford's final challenge assigning error to the trial court's failure to realign defendant Hale as a plaintiff. Ford requested realignment of Hale as a plaintiff so that Ford would not have to share its allotment of preemptory jury strikes [25] with Hale.[26] We find the issue not preserved for review, but we address this issue in the hope that our speaking to the matter will aid the bench and bar. This is a novel issue in our modern jurisprudence.

Hale and her counsel sat on the plaintiff's side throughout the trial, beginning with jury selection. We recognize that Hale filed a cross-claim against Ford, but that claim was severed from this trial. Hale's counsel declined to cross-examine any witness called by Branham but one. The one witness Hale cross-examined was Branham's economic expert. The question: "[H]ow many millions are in a billion?"

The only bona fide defendant in this case was Ford. The following is the totality of Branham's closing argument concerning Hale:

I want to first talk with you just a minute about what occurred in the wreck. . . . Ms. Hale was going down

25. In South Carolina, in a civil action, each side receives four peremptory strikes and the strikes are made on a side-to-side basis until 12 jurors are seated. See S.C.Code Ann. § 14–7–1050 (1976). Therefore, Branham had four strikes and Ford and Hale each had two.

26. It appears Ford's motion to realign Hale was filed prior to jury selection and initially handled off the record. During jury selection, Ford's counsel referred to his earlier motion concerning the "alignment of the parties ... [and] the issue of the number of strikes." Ford's counsel reiterated his concern by noting that Hale's counsel "is sitting over there with the plaintiff."

Cromwell Road at a relatively slow speed, 35 miles an hour, she looked in the back, went to the edge of the road, she made—went to the right, made a steer to the left.

Nobody knows what that steering was because nobody has a picture of it. We could argue about that from now to eternity and nobody would know, because nobody can know. But she was driving ordinary, she wasn't doing anything—she wasn't out there doing any reckless driving out there that day.

. . . .

Here, Ms. Hale looked in the backseat; there's no question about that, she took her eyes off the road. But did she do something that was wrong. She did what all reasonable drivers would do, which was she tried to get back on the road. She made the turn to do it and the vehicle rolled over, at 35 miles an hour, under those circumstances.

 Trial judges in South Carolina have the authority to realign parties. Beyond a court's inherent authority to manage and conduct a trial, our Rule 21, SCRCP, regarding joinder of parties is identical to the federal rule, Rule 21, FRCP.

Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

Rule 21, SCRCP.

Federal courts rely on Rule 21 as authority to realign parties. *See In–Tech Mktg. Inc. v. Hasbro, Inc.*, 685 F.Supp. 436, 442 n. 19 (D.N.J.1988) (noting that Rule 21 "permits [the District] Court, *sua sponte* to re-align *any* party at *any* time"); *First Nat'l Bank of Shawnee Mission v. Roeland Park State Bank & Trust Co.*, 357 F.Supp. 708, 711 (D.Kan. 1973) (noting that the District Court "may order a realignment of the parties 'on such terms as are just' " pursuant to Rule 21). Our sister state of Georgia relies on Rule 21 in recognizing that "a trial court does have the discretion, 'at any stage of the action and on such terms as are just,' ... to realign the

parties." *Cawthon v. Waco Fire & Cas. Ins. Co.*, 259 Ga. 632, 386 S.E.2d 32, 33 (1989) (citing its codified version of Rule 21).

The *Cawthon* decision is instructive. At trial, the Cawthons made a motion to have a co-defendant realigned as a plaintiff. The "Cawthons were concerned that they would be forced to share jury strikes with the [codefendant whose interests were aligned with the plaintiffs]." *Id.* at 33. The trial court recognized the unfairness of the present alignment, "but [stated] that it had no authority to realign the parties." *Id.* Relying on its own version of Rule 21, the Georgia Supreme Court found the trial court erred in "concluding it did not have discretion to realign the parties," and affirmatively held that trial courts have the right to realign parties in the interests of justice. *Id.*

We adopt the reasoning of *Cawthon,* including the authority of a trial court to realign parties "at any stage of the action." *Id.* The decision whether to realign the parties lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of an abuse of discretion and resulting prejudice.

## VI.

The judgment of the trial court is affirmed in part, reversed in part and the case is remanded for a new trial.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

TOAL, C.J., and BEATTY, J., concur.

PLEICONES, J., concurring in part and dissenting in part in a separate opinion, in which WALLER, J., concurs.

Justice PLEICONES.

I concur in part and dissent in part. While I agree that the risk-utility test is the appropriate test for design defect cases, I do not believe this Court has the power to simply discard the consumer expectations test, expressly adopted by the General Assembly in S.C.Code Ann. §§ 15–73–10 through 30. Furthermore, in my opinion, much of the evidence the majority views as improper "post-manufacture" evidence was properly

admissible to prove (1) the foreseeable risk of harm posed by the Bronco II as produced, (2) that the proposed alternative designs could have reduced or avoided the foreseeable risk, and (3) that the Bronco II, absent the alternative designs, was not reasonably safe.

## I. Risk–Utility Test

As the majority notes, the General Assembly adopted the Restatement (Second) of Torts § 402A in 1974. *See* S.C.Code Ann. §§ 15–73–10 through 30. The comments to § 402A, which form the basis for the consumer expectations test, were expressly adopted as legislative intent. S.C.Code Ann. § 15–73–30. The majority then notes that the American Law Institute has, in the Restatement (Third) of Torts, moved away from the consumer expectations test for design defects in favor of the risk-utility test and proposes that this Court do the same. While I agree with the majority that the risk-utility test is the appropriate test for design defect cases, I do not believe that this Court has the authority to simply reject the General Assembly's chosen test, even if we believe that body would approve of the change. *See Benat v. State Farm Mut. Ins. Co.,* 286 S.C. 132, 333 S.E.2d 57 (Ct.App.1985) ("It is the duty of this court to interpret the law. We have no legislative authority and cannot vary a statutory scheme and this is true no matter how logical the basis of the variance.").

However, I believe that this Court may effect the same result under the existing statute by interpreting the consumer expectations test in the specific context of design defect cases. S.C.Code Ann. § 15–73–10 provides that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability. . . ." Comments to § 402A explain that a product is in a "defective condition unreasonably dangerous to the user or consumer or to his property" when the product is in "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A cmt. g. A product is unreasonably dangerous when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer." Restatement (Second) of Torts § 402A cmt. i. These comments form the basis for the consumer expectations test.

In my view, given the complexity of many modern products, a consumer's expectations are not directed to any specific characteristic of the design, but rather to the manufacturer's design decision. The ordinary consumer expects that the manufacturer will weigh the foreseeable risks against the benefits and only offer a product for sale to the general public if the latter outweighs the former. *See* 60 S.C.L.Rev. 1101.

Accordingly, I concur in the majority's decision to apply risk-utility principles to design defect claims. However, in my view, such change must be achieved within the framework of existing statutory provisions.

## II. Post–Manufacture Evidence

I respectfully disagree with the majority's stance on "post-manufacture" evidence. The majority reverses the jury verdict based, in part, on its finding that "Ford was prejudiced by Branham's unrelenting pursuit of post-manufacture evidence on the issue of liability." The opinion defines "post-manufacture evidence" as "evidence of facts neither known nor available at the time of manufacture." Such evidence is, in the majority's view, inadmissible because "[w]hen assessing liability in a design defect claim, the judgment and ultimate decision of the manufacturer must be evaluated based on what was known at the time of manufacture." I believe the majority's rule sweeps too broadly and absorbs within its ambit evidence which is properly admissible in a design defect case.

I note at the outset that the majority opinion may be read as barring any evidence *created* after the date of manufacture. If this is the majority's view, I strongly disagree. In my view, such a rule would deprive the fact finder of relevant evidence regarding what the manufacturer knew or should have known, design alternatives, and the risk inherent in the manufacturer's design.

In a products liability action, the plaintiff must prove (1) that he was injured by the product; (2) that the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant. *See Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 539, 462 S.E.2d 321,

326 (Ct.App.1995). Under the risk-utility test for design defect cases, a plaintiff must prove the second element, product defect, by showing that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller ... and the omission of the alternative design renders the product not reasonably safe." Restatement (Third) of Torts: Products Liability § 2(b) (1998).

In seeking to meet his burden, the plaintiff introduced the following evidence which the majority finds objectionable:

(1) A memo dated April 14, 1989, dealing with a meeting that three Ford engineers had with representatives from Consumer Reports, discussing a comparative test of the Bronco II and other similar cars, showing the Bronco II to have a higher fatal rollover rate than the other cars.

(2) A film, taped in 1989, showing "J-tests" comparing the Chevy Blazer and Bronco II, and demonstrating that the Bronco II did not handle as well as the Blazer.

(3) A document that compared a 1989 Bronco II to a prototype of the Ford Explorer, showing that the handling strategy of the Bronco II makes the vehicle more sensitive to steering over-corrections that seem to be part of most rollover scenarios.

In finding the above evidence improper and inadmissible, the majority notes that:

Whether the 1987 Ford Bronco II was defectively designed and in a defective condition unreasonably dangerous must be determined as of the 1986 manufacture date of the vehicle. Ford's 1986 design and manufacture decision should be assessed on the evidence available at that time, not the increased evidence of additional rollover data that came to light after 1986.

While I agree in general with the majority's proposition, I note that *when* the reports were generated or tests conducted is of little consequence, since testimony established that the vehicles tested were substantially the same as the model involved in the accident, the testing methods were available to Ford prior to the date of manufacture, and the rollover risk was known to Ford prior to the date of manufacture. In

short, the date on which the evidence was created is of little utility in determining the relevance of the evidence and a broad rule barring evidence created "post manufacture" actually serves to defeat the goals of the risk-utility test.

First, I believe the evidence was admissible to show foreseeable risk. The risk-utility test, as set forth in the Restatement (Third) of Torts, speaks not in terms of evidence of risk of which the manufacturer was *actually* aware, but in terms of *foreseeable* risk. No party disputes that Ford had the ability to test the 1987 Bronco II in the same way as was done in the disputed evidence mentioned above. In fact, Ford conducted such tests, the results of which led some Ford engineers to conclude that the wheel base design was flawed.[27] Consequently, in my view, the memo, film, and document were properly admissible to show foreseeable risk, an essential element of the plaintiff's burden of proof in a design defect case.[28]

Second, I believe the video was admissible to show the viability of the proposed reasonable alternative design. To satisfy the risk-utility test, the plaintiff must prove, in most instances, that the foreseeable risk could have been avoided by the adoption of a reasonable alternative design. Restatement (Third) of Torts: Products Liability, § 2 cmt. d. The alternative design must be one that could have been practically adopted at the time of the sale. *Id.*

The plaintiff proposed reasonable alternative designs that were available at the time of manufacture, i.e. the MacPherson Strut suspension system and SLA suspension system, and he was entitled to an opportunity to show that the alternative designs could have reduced or avoided the foreseeable risk. Testimony at trial established that the Blazer used the SLA suspension system and the video demonstrated that the SLA

---

**27.** Even if the risk-utility test considered only the manufacturer's *actual* knowledge of the risk, introduction of the memo, film, and document would not be prejudicial to Ford as this testimony demonstrates that Ford was aware of the stability problems demonstrated in the "post-manufacture" evidence.

**28.** I note that a rule barring any evidence created after the date of manufacture would bar nearly all evidence created by a party other than the defendant manufacturer, as it is the only party with access to the vehicle prior to the date of manufacture.

system remedied the alleged rollover propensity of vehicles using the Twin I–Beam suspension system. The video was therefore, in my view, properly admitted.

Finally, I believe the memo, film, and document were properly admissible to aid the plaintiff in proving the final element of the risk-utility test: that "the omission of the alternative design renders the product not reasonably safe." Though the "post-manufacture" evidence dealt with Bronco II vehicles manufactured between 1987 and 1989, testimony at trial established that there were no major changes to the Bronco II after 1987. The vehicles' rollover propensities are therefore relevant to the issue of the reasonableness of Ford's choice of the Twin I–Beam suspension system over the SLA or MacPherson system.

For the reasons stated above, I concur in part and dissent in part.

WALLER, J., concurs.