945 So.2d 144 (2006)
Steven W. JENKINS, Plaintiff-Appellant,
v.
INTERNATIONAL PAPER COMPANY, et al., Defendants-Appellees.
No. 41,566-CA.
Court of Appeal of Louisiana, Second Circuit.
November 15, 2006.
*145 Dollar Laird L.L.P. by Johnny E. Dollar, Monroe, for Appellant, Steven W. Jenkins.
Larry Feldman, Jr., New Orleans, for Intervenor Appellee, International Paper Company.
Juge, Napolitano, Guilbeau, Ruli, Frieman & Whiteley by Jeffrey C. Napolitano; Breaud & Meyers by Andrew H. Meyers, Lafayette, for Appellee, BE & K Construction.
Hayes, Harkey, Smith & Cascio by Thomas M. Hayes, III, Monroe, for Appellee, James Brinkley Co., Inc.
Shotwell, Brown, & Sperry by Clarence A. Martin, III, Monroe, for Appellee, Voith Paper, Inc.
Before BROWN, WILLIAMS and STEWART, JJ.
STEWART, J.
In this products liability action, the plaintiff, Steven W. Jenkins, appeals the *146 dismissal by summary judgment of his claims against defendants, Voith Paper, Inc., and James Brinkley Company, Inc. For the reasons expressed, we affirm.

FACTS
At the time of the accident, Steven W. Jenkins had been employed by International Paper Company ("IP") in Bastrop, Louisiana, for ten years. He spent the last seven of those years as an operator in the re-pulping section of the plant. The re-pulping process converts scrap paper, such as defective rolls, to reusable pulp. From a staging area, the scrap paper was placed on a belt conveyor that was level with the floor; the legs of the conveyor sat in a pit four feet below floor level. The conveyor moved the paper through a guillotine, also referred to as a roll splitter, that cut the rolls. The cut paper was then moved upwards on a slat conveyor to continue the re-pulping process.
The re-pulping system was procured by IP in 1988 and 1989. IP designed the system layout and contracted with Voith Paper, Inc. ("Voith") for the purchase of the machinery for the system. Voith contracted with James Brinkley Company, Inc. ("Brinkley") to manufacture the machinery. The machinery was shipped by Brinkley directly to IP, who contracted with another entity for installation. Once the machinery was installed, the layout left a gap between the staging area and the conveyor. The tires of machinery unloading scrap paper on the conveyor would get caught in the gap, and this damaged the conveyor belts. To remedy the problem, IP installed a metal plate extending from the edge of the staging area toward the conveyor. The metal plate left a smaller gap of 2½ inches between the staging area and the conveyor. The gap created a nip point when the conveyor was operated.[1]
The accident which led to this litigation occurred on July 2, 2002. Jenkins arrived on the job to find that the conveyor was jammed. According to Jenkins' deposition, he stood on the concrete staging area while his co-worker operated the conveyor in reverse so that he could pull out the jammed paper to the staging area. However, he did not realize that the reverse operation was pulling the paper off the staging area and under the machinery. When Jenkins stepped on the moving paper, his feet became entangled in it, and his legs were pulled down into the gap, or nip point, between the concrete staging area and the conveyor. He sustained severe injuries, including crushed ankles and fractured bones in his right leg and knee.
Jenkins filed suit against his employer alleging that the gap posed an extreme danger to workers. He alleged that the gap of 2¼ inches had existed for several years, that IP's managers and supervisors had repeatedly been notified of the danger posed by the gap and asked to place a guard over it or close it in some other way, and that IP had taken no action to remedy the problem.[2] In his first amended petition, Jenkins added eleven more defendants, including Brinkley, all of whom were alleged to either have designed, manufactured, installed, or maintained the re-pulping machinery. Jenkins alleged that the absence of a guard was an unreasonably dangerous condition, and he asserted product liability claims of defective design, defective construction, and inadequate *147 warning. Jenkins reasserted these claims in a second amended petition, which added Voith as a defendant.
Both Brinkley and Voith filed motions for summary judgment, which were granted by the trial court in a judgment rendered March 16, 2006. This appeal by Jenkins followed.

APPLICABLE LAW
Appellate courts conduct a de novo review of summary judgment under the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730. Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Welch v. Technotrim, Inc., 34,355 (La.App.2d Cir.1/24/01), 778 So.2d 728, writ denied, XXXX-XXXX (La.6/15/01), 793 So.2d 1232.
The burden of proof remains with the movant. La. C.C.P. art. 966(C)(2). However, when the moving party will not bear the burden of proof at trial on the matter before the court on summary judgment and points out an absence of factual support for one or more elements essential to the adverse party's claim, the non-moving party must produce factual support sufficient to show that he will be able to satisfy his evidentiary burden at trial. Otherwise, there is no genuine issue of material fact for trial, and summary judgment is appropriate. La. C.C.P. arts. 966 and 967; Welch, supra.
The exclusive theories of liability for manufacturers for damages caused by their products are set forth in the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51 et seq. Welch, supra. A manufacturer shall be liable for damage caused by an unreasonably dangerous characteristic of a product when such damage arose from a reasonably anticipated use of the product. Id; La. R.S. 9:2800:54(A). A seller may be considered a manufacturer if he exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage. La. R.S. 9:2800.53. A non-manufacturing seller does not incur liability under the LPLA unless he vouches for the product by holding it out as his own; however, he may be responsible for damages in tort if he knew or should have known the product was defective and failed to declare it. Slaid v. Evergreen Indem., Ltd., 32,363 (La.App.2d Cir.10/27/98), 745 So.2d 793, writ denied, 97-3036 (La.2/13/98), 709 So.2d 751.
A product may be unreasonably dangerous in the following four ways: (1) construction or composition; (2) design; (3) inadequate warning; and (4) nonconformity to an express warranty. La. R.S. 9:2800.54(B). The plaintiff has the burden of proving a product is unreasonably dangerous. La. R.S. 9:2800.55(D). Defects are not presumed by the mere occurrence of an accident. Welch, supra. Jenkins has alleged that the unguarded gap was unreasonably dangerous in construction, design, and inadequate warning.

SUMMARY JUDGMENT EVIDENCE
Brinkley's Motion for Summary Judgment
Brinkley claims IP created the dangerous condition by installing the conveyor in a pit so that the belts would be at floor level and later covering the gap between the staging area and conveyor with a metal plate thereby creating an even smaller gap and a nip point. Brinkley states the machinery *148 it manufactured was not unreasonably dangerous in construction, did not deviate from specifications, and had no defect upon leaving its control. Brinkley claims it did not know the conveyor was to be installed with the belts at floor level. Moreover, it did not design or install the metal plate to cover the gap. Brinkley claims it had no duty to warn of the danger posed by the nip point created by IP's installation and layout. Jenkins was a sophisticated user who knew of the danger posed by the nip point, and he was not engaged in a reasonably anticipated use at the time of the accident. Rather, Jenkins was violating IP's policy by standing in the staging area while the conveyor was operating in reverse.
Brinkley's exhibits in support of its motion include affidavits of Clyde L.Crawford, III, Brinkley's president, and Gary L. Edwards, Brinkley's senior project manager, attesting that Brinkley had no knowledge of IP's plan to install the conveyor at floor level and was not involved in the installation of the machinery at IP. Supplemental affidavits offered in response to Jenkins' opposition relate that Brinkley was not provided IP's layout drawing showing the conveyor mounted in a pit, that Brinkley would not have had to know that the conveyor was to be mounted in a pit to provide an anchor bolt layout for the machinery, and that Brinkley's drawing showing the control panel four feet above the conveyor does not mean it knew the belts were at floor level.
Excerpts from the deposition of Maurice Bertrand Marquis, IP's corporate representative, relate that IP had no documentation of Brinkley being present at the installation of the machinery or involved in the installation of the metal plate over the gap. Marquis explained that IP installed the metal plate to prevent the tires of tow motors from damaging the belts when unloading scrap rolls on the conveyor. After the accident, IP installed a cap plate to remedy the gap problem. Marquis testified that Jenkins violated IP's policy by not shutting off the conveyor when working on it or dangerously close to it. As shown by a safety warning issued to Jenkins on June 18, 2003, IP concluded that he violated policy by working on the guillotine conveyor without placing it in ZES (zero energy state), by working on a moving conveyor, and by overriding the jog button that controlled reverse operation. IP believed that Jenkins had jammed a knife in the jog button to keep the conveyor running while he worked on it.
Brinkley's exhibits also include excerpts from Jenkins' deposition, in which he testified the gap had been there as long as he could remember. Jenkins said he had notified managers and a safety leader about the danger posed by the gap, but nothing had been done. He denied standing on the conveyor belt while it was moving.
Voith's Motion for Summary Judgment
Voith argues that it is a non-manufacturing seller and had neither notice nor knowledge of any defects in the products sold to IP. Voith asserts that it did not install the machinery at IP and was not involved in its maintenance. Finally, Voith asserts that, as the seller, it had no duty to warn, particularly as the gap was an open and obvious danger, and Jenkins was a sophisticated user who knew of the danger.
Voith's exhibits include excerpts from Jenkins' deposition regarding his knowledge about the gap as related above. These excerpts also reveal that Jenkins had been a safety advocate for three years and had been concerned about the danger posed by the gap.
The exhibits also include excerpts from the Marquis deposition. These refer to drawings of the re-pulper machinery layout *149 prepared by IP. Marquis did not know who decided to mount the conveyor legs in a pit so that the belts would be level with the floor surface; however, he admitted that IP would have either had to build the area where the re-pulper machinery was to be installed or to contract with someone to do so.
The affidavit of Robert J. Matz, Voith's vice-president of engineering, states that Voith was not involved in designing, engineering, or manufacturing the machinery sold to IP. It simply purchased the equipment from Brinkley, who shipped it directly to IP. Matz claims that Voith neither installed nor provided maintenance for the equipment.
Jenkins' Opposition to the Motions for Summary Judgment
Jenkins asserts that material facts in dispute preclude summary judgment. He argues that Voith should be considered a manufacturer, because it was involved in the design process and was present at the installation of the machinery. He claims that Voith's drawings of a similar system were the guiding point for the development of IP's system. Jenkins admits that while he knew of the danger posed by the gap, he did not know of the specific danger posed when operating the conveyor in reverse. He had never seen paper on the staging area pulled under the machinery during reverse operation.
Jenkins argues that Brinkley knew the conveyor was to be mounted in a pit so that the belts would be at floor level. He cites an OSHA regulation, 29 C.F.R. § 1910.212, which requires a guarding device at the point where operation of the machine might expose an employee to injury, as imposing a duty on both Brinkley and Voith to have provided a guard device for the gap. Included in Jenkins' exhibits are Brinkley's guarantee and Voith's proposal to IP on March 22, 1988, both of which state that they endeavor to comply with OSHA regulations but do not guarantee that the equipment supplied is in full compliance.
Among Jenkins' exhibits are records regarding the sale and manufacture of the re-pulper machinery, including drawings by IP, Voith, and Brinkley. Also among the records is Voith's proposal to IP on March 22, 1988, which includes operating data, features, material specifications, and dimensional data for the re-pulper system.[3] The proposal suggests options for changes in the system. Jenkins stresses the importance of a fax from Voith to Brinkley on August 31, 1988, reminding Brinkley that IP wanted written confirmation that "the overall system layout they made is exactly how the equipment is to be installed." The fax noted that IP was to be provided an "anchor bolt layout" for the system showing the location of all the anchor bolts for the equipment on one drawing.
Jenkins' exhibits also include customer call reports by Voith which show that it sent representatives to IP from April 18, 1989 to April 21, 1989, for support during the start-up of the re-pulping system. *150 There are additional reports by Voith from June and July of 1989, regarding problems IP wanted addressed, including an unguarded chain and sprocket area on the dewiring conveyor which IP believed Voith should have provided.[4] Voith's report notes that IP's drawings showed the dewiring conveyor without guards and that it quoted the job and got approval of the drawings without including the disputed guards.
Finally, Jenkins offers an expert report by Dr. P.F. Packman, a professor of materials and mechanical engineering at Southern Methodist University. Dr. Packman describes the gap between the conveyor and staging area as a latent defect that was designed into the system and became activated when the conveyor ran in reverse. The gap and the absence of a guard made the conveyor unreasonably dangerous. Without reference to specific records, Dr. Packman concludes that both Brinkley and Voith had input in the design of the system. He explains that prior to 1988, good engineering practice required evaluation of a design for potentially dangerous "pinch points" so that either they could be designed out of the system or guards and warnings put in place to prevent injury. He concludes that the remedy of covering the gap, as IP did after the accident, was something that Voith and Brinkley could have included in the designs of the system without any adverse effect on the system's utility.

REVIEW
Construction and Composition
La. R.S. 9:2800.55 states:
A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.
A claimant must demonstrate not only the manufacturer's specifications or performance standards for the particular product, but also how the product materially deviated from those standards so as to render it "unreasonably dangerous." Welch, supra; Morris v. United Services Auto. Ass'n., 32,528 (La.App.2d Cir.2/18/00), 756 So.2d 549.
Jenkins claims that his injury was caused by the gap between the staging area and conveyor, and that the gap was unreasonably dangerous in construction or composition of the re-pulper system. Having reviewed the submissions in support of and in opposition to summary judgment, including the drawings and specifications for the re-pulper system, we find no factual support for this claim. None of the specifications include a guard on the conveyor where placed adjacent to the staging area. There is no evidence that the conveyor was not manufactured according to either specifications provided to Brinkley or performance standards for similar products manufactured by Brinkley. In fact, the dangerous gap of 2¼ inches resulted from IP's attachment of a metal plate to the staging area sometime after installation of the re-pulper system in its plant. It did not result from an act of either Brinkley or Voith. We find that Jenkins lacks factual support for this claim and will be unable to meet his evidentiary burden at trial on this issue.
Design
Jenkins' claims against Voith and Brinkley rests largely on the design issue. La. R.S. 9:2800.56 states:

*151 A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
Thus, the claimant must prove there existed another way to design the product at the time of manufacture, the alternative design would have either been significantly less likely than the chosen design to cause the damages or would have significantly reduced such damage, and the likelihood that the product as designed at the time it left the manufacturer's control would cause the damage along with the gravity of the damage outweighed the burden on the manufacturer of adopting the alternative design identified by the claimant. Johnson v. Black & Decker U.S., Inc., 29,996 (La.App.2d Cir.10/31/97), 701 So.2d 1360, writ denied, 97-2971 (La.2/6/98), 709 So.2d 741.
The unreasonably dangerous condition identified by the plaintiff as the cause of the accident is the gap of 2¼ inches between the staging area and the conveyor. Dr. Packman's report concluded that the gap was designed into the system and dimensioned in Brinkley's design drawing in 1988. He also asserted that Voith had design input and drew design specifications. Dr. Packman explained that good engineering practice in 1988, required Voith or Brinkley to evaluate the design for dangerous pinch points so that these could either be eliminated or protected by a guard. He suggested that either Voith or Brinkley could have designed and installed a simple guard similar to that ultimately used by IP after the accident.
Review of the Brinkley drawing referred to by Dr. Packman does not support his claim that the gap was dimensioned in its drawing. The Brinkley drawing is of the guillotine with belt conveyor standing alone. It is not shown in relation to the staging area as part of IP's planned layout. Contrary to Jenkins' assertions, nothing in the Brinkley drawing shows that the conveyor was to be mounted in a pit with the belts at floor level in close proximity to a staging area where a dangerous nip point might be created. Voith's drawing appears substantially the same as Brinkley's. The only drawing showing the layout of the entire system is IP's drawing (No. 176-L-IPE), which includes a gap of one foot between the staging area and the conveyor and does not call for any guard at the start of the conveyor. Jenkins has no evidence that Brinkley received IP's drawing, which showed the layout of the re-pulping system in conjunction with the staging area. Affidavits submitted by Clyde Crawford and Gary Edwards of Brinkley specifically deny receipt of the drawing or knowledge of IP's planned layout.
Review of the exhibits establishes that the gap was not the result of the manufacture or design of the conveyor and re-pulper machinery by either Voith or Brinkley. The gap between the staging area and the conveyor was the result of IP's design layout and installation of its re-pulper system. This layout was not designed by either Voith or Brinkley. Nor does the record show that either Voith or *152 Brinkley was involved in creating the 2¼ inch gap with the dangerous nip point. Rather, IP designed the layout and, sometime after installation of the re-pulper machinery, created the 2¼ inch gap by installing a metal plate extending from the staging area toward the conveyor in an effort reduce the larger gap so as to prevent damage to the conveyor's belts. It did not install the plate as a guard to protect its employees from a dangerous nip point. Other than Jenkins' unsupported statement in his brief that the larger gap of 8¼ inches posed an even greater danger, there is no evidence that the larger gap designed into the system by IP posed a danger by creating a nip point, raised safety concerns, or required a guard for employee safety. This lack of evidence coupled with the fact that creation of the 2¼ inch gap was solely due to IP's attachment of a metal plate to the staging shows an absence of factual support for Jenkins design claim.
Because the gap was created solely by IP's system layout and installation of the metal plate, Jenkins exhibits in opposition to the motions for summary judgment do not establish that he will be able to meet his evidentiary burden at trial. The exhibits do not show that either Voith or Brinkley designed the system layout, and there is no showing of a defect in the design of the machinery sold by Voith and manufactured by Brinkley. Even considering the OSHA regulation, 29 C.F.R. § 1910.212, requiring a guard at ingoing nip points or at the point of operation on the machine where the work is actually performed on the material being processed, Jenkins has not produced evidence to establish that this regulation required either Voith or Brinkley to ensure that a guard was attached to the conveyor. Dr. Packman's opinion that Voith and Brinkley should have evaluated the system for possible "pinch points" does not raise an issue of fact as the gap between the staging area and conveyor resulted from the system layout, and neither defendant designed the system layout. Defendants were only involved in the sale and manufacture of the machinery components for the re-pulper system.
Inadequate Warning
La. R.S. 9:2800.57 provides:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristic.
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its *153 danger to users and handlers of the product.
As stated, the unreasonably dangerous condition of the 2¼ inch gap did not exist when the guillotine conveyor left Brinkley's control or even when Voith's representatives were present at IP for the start-up of the system. The gap was not a characteristic of the machinery sold by Voith and manufactured by Brinkley. It was the result of IP's layout and later installation of a metal plate. Nothing in the record even suggests that either defendant had knowledge of IP's installation of the metal plate to protect the belts from damage. Consequently, neither defendant could be responsible for warning of a condition of which they had no knowledge and which did not exist until sometime after the manufacture and installation of the re-pulper system.
Moreover, excerpts from Jenkins' depositions establish that he had knowledge of the danger posed by the gap. His claim that he did not know of the danger posed by reverse operation of the conveyor is not convincing and does not create an issue of fact. Even if, as claimed, he had never seen paper pulled under the machinery during reverse operation, the danger posed by the gap is that of an employee becoming ensnared in the nip point during the conveyor's operation. This danger is obviously present both in forward and reverse operation. Jenkins lacks factual support for the claim of inadequate warning.

CONCLUSION
Upon review of the record, we find no genuine issue of material fact that would preclude summary judgment dismissing Jenkins' claims against Voith and Brinkley. Costs of the appeal are assessed against the plaintiff-appellant.
AFFIRMED.
NOTES
[1] Though not specifically explained in the record, a nip point appears to be an area where a narrow opening exists in machinery and poses a danger during operation of ensnaring workers and causing injury.
[2] Various parts of the record refer to the gap as being either 2 ½ or 2¼ inches. Either way, the gap was slightly more than two inches.
[3] Voith's proposal letter of March 22, 1988, refers to the re-pulper machinery being sold as a "Pulper Charging System," which includes a Roll Splitter with Thru Conveyor, Slat Conveyor, and Dewiring Dump Table. Our review of the record suggests that the Roll Splitter with Thru Conveyor is what the parties refer to as the guillotine cutter and guillotine conveyor or belt conveyor onto which the scrap paper is loaded and conveyed through the guillotine or splitter. Additional machinery for the system was sold by Voith via a proposal letter of May 17, 1988; this proposal pertained to the sale of a Downender and Dewiring Conveyor with Bale Shunt and does not appear to be related to the accident.
[4] The dewiring conveyor is not the conveyor involved in Jenkins' accident.