HANS J. LILJEBERG, Judge!
| sin this products liability action, plaintiffs appeal the trial court’s judgment,'rendered in accordance'with a jury verdict, in favor of defendants. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY

The Commonwealth is a 67-foot wooden yacht built in 1936. According to plaintiff, Dr. Ward Sudderth, he purchased the Commonwealth in 2004 through a corporation of which he is the sole shareholder, G & S, Inc. (“G & S”), also a plaintiff in this matter. After they purchased the vessel, Dr. Sudderth and G & S began renovating and restoring it.
Although there were portable fire-suppression units on the Commonwealth, in September of 2010, Dr. Sudderth consulted with employees of Donovan Marine, Inc., a marine wholesaler, about obtaining an automatic fire-suppression system. Based on their discussions, Dr. Sudderth purchased a Sea-Fire Model FE1000A automatic fire-suppression system manufactured by Metalcraft, Inc. John (“Jay”) LMatherne, who worked on the renovations of the Commonwealth for Dr. Sudderth, installed the automatic fire extinguisher in the engine room of the Commonwealth with the bottom of the cylinder approximately six or seven inches above the deck boards.
On the night of June 6, 2011, a fire started in the engine room of the Commonwealth and continued into the early morning hours of June 7, 2011, When it was extinguished by the fire department. According to the- evidence presented, the fire started when an exterior winch- motor “shorted out”, due to heavy rain, causing the winch to turn on and to continue pulling power from the battery until the battery overheated, caught fire, and set the yacht on fire. During the fire, the automat *555 ic fire extinguisher did not discharge or activate.
On May 31, 2012, Dr. Sudderth and G & S filed a Petition for Damages against several defendants, including: 1) Mariner Electric Company, Inc. (“Mariner”), an electrical contractor that-performed work on • the Commonwealth; 2) Joey Muth, president of Mariner; 3) Richard Muth, an electrician employed by Mariner; 4) Met-alcraft, Inc., as manufacturer of the fire extinguisher; 5) Sea-Fire Marine, a Division of Metalcraft, Inc-., as manufacturer of the fire extinguisher; 6) Sea-Fire Marine, as manufacturer of the fire extinguisher; 7) Trojan Battery Company, as manufacturer of the battery; and 8) Great American Insurance Company of New York, as an alleged insurer of Mariner and the Muths.
In their petition, plaintiffs alleged that the electrical system installed by Mariner was substandard and negligently installed, because it lacked a working circuit breaker in the winch line. They claimed that the failure to install a proper electrical system resulted in the fire and extensive damage to the Commonwealth. Plaintiffs further asserted that Metalcraft, Inc., Sea-Fire Marine, a Division of Metalcraft, Inc., and Sea-Fire Marine (hereinafter collectively referred to as | ¿‘Metalcraft”) are liable as the manufacturers of the automatic fire-suppression system, because it was defective, unreasonably dangerous in design, construction, and composition, and did not perform as advertised, which is a breach of an express warranty. They also claimed that Metalcraft did not give an adequate warning about the dangers of the risk of failure of the fire-suppression system.
On October 10, 2014, ¡Metalcraft filed a Motion for Summary Judgment, asserting that the claims against it should be dismissed because plaintiffs had failed to show a defect in the product and had not put forth sufficient evidence- to present a claim under the Louisiana Products Liability Act (“LPLA”), La. R.S. 9:2800.51, et seq., or any other theory of recovery. It argued that there was no evidence to show that the automatic extinguisher was unreasonably dangerous in construction, composition, or design, or that it contained inadequate warnings or failed to. conform to an express warranty.
Thereafter, on December 17, 2014, Dr. Sudderth and G & S filed a Motion for Partial Summary Judgment, asserting that they were entitled to judgment as a matter of law on the issue of breach of an express warranty. They claimed that the evidence shows that the automatic extinguisher failed to discharge at 175 degrees Fahrenheit during the fire, which it was expressly warranted to do.
After a hearing on January 13, 2015, the trial judge denied both the Motion for Summary Judgment filed by Metalcraft and the Motion for Partial Summary Judgment filed by Dr. Sudderth and G & S.
Prior to trial, Mariner, Richard Muth, and Joey Muth settled with the plaintiffs, and Trojan Battery Co., was dismissed from this matter on summary judgment. Thus, Metalcraft was the only defendant remaining at the time , of trial. - . ■
A jury" trial began on January 26, 2015. At trial, Ernest Ellis, the president' of Metalcraft, testified’ that the fire-suppression system at issue was manufacturedj 2010 and was designed to protect unoccupied engine compartments. - He stated that the actuation temperature for the unit was 175 degrees Fahrenheit, and that it was designed to activate when the temperature of the sensor bulb itself, not the air in the surrounding area, reaches this temperature. - Mr. Ellis stated that the metal of the unit will absorb some heat, and thus, the temperature of the sensor *556 valve may not reach 175 degrees when the ambient temperature reaches 175 degrees. Mr. Ellis stated that he believes the fire extinguisher would have discharged and the majority of the damage would have been prevented if the unit had been installed properly.
Jay Matherne testified that in approximately 2007, he began performing some renovation work on the Commonwealth for Dr. Sudderth. Mr. Matherne stated that the automatic fire-suppression system was the last thing installed in the engine room before the fire occurred. He testified that the installation instructions provided that the fire extinguisher should be installed at a location as high as possible on a bulkhead, and that it was preferable to locate the detector head near the area where a fire would most likely occur, such as the fuel line side of the engines near the carburetor or fuel pump. The instructions also stated that the detector head should be kept away from the exhaust manifold.
Mr. Matherne testified that the engine room of the Commonwealth only had one accessible bulkhead, so he installed the fire extinguisher as high as possible on this bulkhead near the fuel filters, which was as far from the engine exhaust as possible. He stated that electrical or air conditioning modifications would have to have been made in order to place the extinguisher any higher.
On cross-examination, Mr. Matherne testified that a location for the fire extinguisher was not “mapped out” before the electrical and air conditioning work was done in the engine room. After this work was performed, he installed the 17extinguisher in a location where it could be placed without moving other things. He testified that two air conditioning ducts with fiberglass insulation were located two to three inches above where he installed the fire extinguisher. Mr. Matherne went to the location after the fire and did not see any fire damage to the wood directly behind the fire extinguisher.
Dr. Sudderth testified that he spoke with an employee of Donovan Marine in September of 2010 about purchasing an automatic fire-suppression system and the employee recommended the Sea-Fire system that he ultimately purchased. The engine room of the Commonwealth measures 850 cubic feet, and this fire-suppression system was designed to provide protection for an area ranging from 950 to 1000 cubic feet. Dr. Sudderth testified that he read about this system and was confident that it would put out a fire in his engine room. After the fire, Dr. Sudderth contacted a fire expert, George Casellas, who came to the vessel to investigate. After meeting with Mr. Casellas, Dr. Sud-derth realized the automatic fire extinguisher had not discharged during the fire.
The canister of the fire extinguisher was tested at Kennedy Fire Laboratory in Florida, and representatives of both plaintiffs and defendants were present. According to Dr. Sudderth, the unit was tested using a “gun of hot air at the bulb” and it did not activate until the temperature reached 196 degrees Fahrenheit after testing for approximately 52 minutes.
On cross-examination, Dr. Sudderth testified that he did not read about the technical specifications or the activation temperature for the fire extinguisher before he purchased the unit, but he did read about them before it was installed. He acknowledged that the instructions provided that the extinguisher was supposed to be installed “as high as possible.” However, he did not believe that it could have been installed any higher in this case because the am conditioning ducts were |sthree to four inches above it. He also believed that it was installed in the best place considering that the instructions indicated it should *557 be placed close to the fuel line. Dr. Sud-derth testified that he did not think it was best to move or reroute the air conditioning ducts in order to install the extinguisher in a higher location. He also admitted that the owner’s manual does not refer to ambient temperature where it indicates that the activation temperature is 175 degrees.
Plaintiffs’ expert in electrical engineering, fire cause and origin, fire investigation, and failure analysis, George Casellas, testified at trial. He stated that Dr. Sud-derth contacted him a couple of days after the fire and he went to the scene to investigate. He determined that the fire had started “at the battery bank, .the last battery on the aft side or the rear side of the boat.” He noticed that the. fire extinguisher did not discharge or actuate during the fire.
Based on the damage he observed, Mr. Casellas “found it very hard to believe” that the fire went on for approximately five hours and the extinguisher did not discharge. He stated that “there was no doubt that the temperature around the extinguisher itself and particularly around the sensor area would have reached in excess of 175 degrees.” He stated that the basis of this opinion was that there were combustibles within a two-foot radius of the cylinder head that were compromised during the fire. He noted that the inspection tag for the extinguisher was damaged in the fire, and he stated that he would expect it to start charring at around 300 degrees. Mr. Casellas noted that the inspection tag was below the activation bulb for the discharge head of the cylinder,- and he believed that it was “very likely” that the temperature exceeded 175 degrees at the location of the discharge head on the cylinder.
Mr. Casellas stated -that he believed the fire extinguisher was properly installed. He stated that-there was no better place to install it, considering the most |8likely cause of a fire is the fuel system, and it was installed only 12 inches away from the fuel filters, fuel pumps, and fuel lines, and in between the two engines.
On cross-examination, Mr. Casellas admitted that “higher is better” for placement of a fire extinguisher because hot air rises-. He testified that he examined the cylinder before it was tested and he did not visually see any defects in the bulb. The only defect he identified was “that it didn’t work as intended and discharge at 175 degrees.” He admitted that the insulated air conditioning ducts above the extinguisher would repel some heat and, if heat was coming down, they “would definitely act as a deflection.” He agreed that the fire damage was much worse higher on the bulkhead, and that the wood directly behind the cylinder did not appear to have any fire damage. Mr. Casellas did not believe' that the damage to the inspection tag was likely caused by “drop down.”[1]
Metalcraft presented the testimony of its expert in fire investigation, fire protection, and failure analysis, Richard Meier. On July 2, 2011, Mr. Meier went to the Commonwealth to investigate the fire. He testified that the fire originated in “the aft battery of the battery bank on-the port side” and that the fire was' electrical in nature. Defense counsel questioned Mr. Meier about a photograph of the fire extinguisher on which a line was drawn above *558 the top of the fire extinguisher. Mr. Meier stated that the photograph shows a line of demarcation reflecting a difference in the conditions above and below the line, with the wood intact below the line and evidence of heat damage above the line. He stated that as the smoke and hot gases traveled through the engine room, it was “kind of'the dividing point,” with “hot gases above and cooler air below.” He also testified that a security camera in one of the photos had a plastic casing that showed no | ^discoloration, melting, or sagging, and he stated that most plastics start melting or softening at about 175 degrees.
Mr. Meier further testified that the insulated air conditioning ducts -just above the fire extinguisher would have had an effect on the transmission of heat in the engine room. He stated that the duets “would block any radiant heat that came down from the hot gases above” and “block any convection currents that might be stirring around in the engine room.” He testified that the heat buildup would not have been by the fire extinguisher but at the top of the engine, room. He also agreed that heat would have been able to be exhausted through the plenum or ductwork and out through other areas.
Mr. Meier testified that the top of the extinguisher cylinder was installed 47 inches from the ceiling and the bottom was six or seven inches above the deck boards. He noted that the installation instructions provide that the unit should be installed as high as possible, but he believes the extinguisher was installed almost “as low as you can go.” He testified that the fire extinguisher should have been placed at the top of the compartment, and he believes that it would have been possible for the air conditioning ducts to have been lowered down the wall in order for the fire extinguisher to have been placed higher.
Mr, Meier stated that the plywood behind the fire extinguisher showed no signs of charring or other heat damage. Although the inspection tag on the fire extinguisher did show signs of melting or heat damage, he believes that the damage to the tag was consistent with drop down because the entire tag was not damaged and just showed “localized heating.”
With regard to the testing of the cylinder and the two exemplars, Mr. Meier testified that the fire extinguisher would not be expected to activate as soon as the temperature from the heat gun reached 175 degrees. He explained that not all of | nthe heat that was blown onto the extinguisher went directly to the sensor bulb because some of it was being transferred to other structures. He stated that there was no way to measure the exact-temperature of the liquid in the bulb during this testing. He indicated that the testing started with a temperature of 150 degrees and was raised approximately two degrees per minute. Mr. Meier testified that after the air was raised to 175 degrees with the heat gun, it only took five minutes and 38 seconds for the extinguisher to discharge. At the time of discharge, the temperature was 196 degrees. The two exemplars discharged, at 194 degrees and 197 degrees respectively, so he believes all three units worked consistently and properly.
On cross-examination, Mr. Meier explained that actuation temperature and ambient temperature are not the same. He stated that the ambient temperature was 196 degrees when the fire extinguisher went off during testing, but he believes the fire extinguisher discharged when the temperature of the bulb reached 175 degrees during testing, in accordance with the specifications. He stated that the bulb will break when the temperature inside reaches 175 ± ■ three degrees, but the amount of heat actually being transferred *559 to the bulb will determine how fast it will break. He also believes that the fire extinguisher would have discharged during the fire if it had been properly installed. He saw no evidence that there was enough heat at the sensor to activate the fire extinguisher during .the fire at issue.
• At the conclusion of trial, on January 29, 2015, the jury returned’ a verdict in favor of defendant, Metalcraft, finding that' it was not liable for the damages sustained by Dr. Sudderth and G & S. As indicated on the “Jury Interrogatories and Verdict Form,” the jury concluded that the Metal-craft fire-suppression system was not unreasonably dangerous, finding that it did not: 1) contain a manufacturing or 1 ^composition defect; 2) fail to conform to an express warranty; or 3) contain an inadequate warning.
On February 6, 2015, Dr. Sudderth and G & S filed a “Motion for Judgment Notwithstanding Jury’s Verdict,” in which they argued that the jury’s verdict was not supported by the evidence presented at trial. After a hearing on March 24, 2015, the trial judge denied plaintiffs’ motion. Thereafter, on April 23, 2015, the trial judge signed a judgment in favor of Metal-craft, in accordance with the jury’s verdict. Dr. Sudderth and G & S appeal.

LAW AND DISCUSSION

The LPLA provides the-exclusive theories of liability for manufacturers for damage caused by their products. La. R.S; 9:2800.52. The elements of a cause of action under the LPLA that must be proven by the claimant are:. 1) the defendant is the manufacturer of the product; 2) the claimant’s damage was proximately caused by a characteristic of the product;. 3) this characteristic made the product unreasonably dangerous; and 4) the claimant’s damage arose from a reasonably anticipated use of the product by the claimant or someone else. La. R.S, • 9:2800.54; Reynolds v. Bordelon, 14-2371 (La.6/30/15), 172 So.3d 607, 612-613; Ortolano v. BDI Marketing, 05-989 (La.App. 5 Cir. 4/25/06), 930 So.2d 192, 194-195. A product is unreasonably dangerous if and only if the product is unreasonably dangerous: 1) in construction or composition; 2) in design; ■ 3) because an -adequate warning about the product has not been provided; or 4) because it does not conform to an express warranty. La.= R.S. 9:2800.54(B).
In their first assignment of error, Dr. Sudderth .-and G & S assert that the trial court erred by denying their Motion for Partial Summary Judgment regarding express warranty, where Metalcraft offered no countervailing affidavits to. contradict the proof offered by plaintiffs. ■.
Lain their Motion for Partial Summary Judgment, plaintiffs noted that the owners’ manual of the fire-suppression system provides as follows:
Sea-Fire units described in this manual are automatically activated by a temperature sensor valve. Discharge will occur when the sensor valve temperature rises to the system activation point as shown in the specification table and on the label attached.to each unit.
The designated' discharge temperature for the-unit at issue was 175 degrees Fahrenheit. In their motion, plaintiffs argued that they specifically relied on the representation that the systém would discharge at 175 degrees, but it: failed to do- so. They also asserted that the defect in the fire-suppression system was confirmed during testing after the accident, because the fire extinguisher at- issue" and two exemplars all failed to discharge at the designated temperature of 175 degrees. Plaintiffs claimed that the failure of the system to conform to the manufacturer’s express warranty caused extensive damage.
*560 In support of their Motion for Partial Summary Judgment, plaintiffs submitted copies of the installation instructions and owner’s manual, as well as excerpts from Dr. Sudderth’s deposition. In his deposition, Dr. Sudderth indicated that before purchasing the fire-suppression system, he consulted with a representative of Donovan Marine who informed him that the system was specified to protect vessels with areas up to 1,000 cubic feet and, therefore, it would be sufficient to protect the Commonwealth. Dr. Sudderth also indicated that after he purchased the system, he read the owner’s manual and confirmed the specifications and warranties. Thus, he relied on the warranties set forth by Metalcraft.
Plaintiffs subsequently filed a supplemental memorandum in support, of their motion and submitted an affidavit of plaintiffs’ expert, George Casellas. In his affidavit, Mr. Casellas opined that the automatic fire extinguisher failed to comply with the stated specifications, because it failed to discharge at 175 degrees I Fahrenheit. Mr. Casellas further1 stated that during testing of the subject unit and two other units of the same model, they failed to activate until they were exposed to temperatures of 194-197 degrees for 45-55 minutes, which was not in accordance with the parameters set forth in the owner’s manual. Finally, in his affidavit, Mr. Casellas opined that the placement of the extinguisher was proper and in accordance with the guidelines set forth in the installation instructions.
In opposition to plaintiffs’ Motion for Partial Summary Judgment, Metalcraft argued that plaintiffs could not show that they were entitled to summary judgment, because the fire extinguisher was not defective and it worked exactly as designed. It argued that the extinguisher failed to discharge during the fire because it was improperly installed, which voided any express warranty. Metalcraft asserted that there were genuine issues of material fact regarding: 1) whether an express warranty was made regarding the exact discharge temperature; 2) whether Dr. Sudderth relied upon the alleged express warranty when purchasing or using the unit; 3) whether plaintiffs could prove that the fire extinguisher failed to discharge at the design temperature for the sensor valve; and 4) whether the alleged breach of the purported express warranty caused plaintiffs’ damages.
In support of its position, Metalcraft submitted a copy of the installation instructions, photographs of the fire extinguisher as it was installed in the engine room of the Commonwealth, and a copy of the specification table for the fire extinguisher indicating that the discharge temperature for the model at issue was 175 degrees Fahrenheit.
Appellate courts review the granting or denial of a motion for summary judgment de novo using the same criteria governing the trial court’s consideration of whether summary judgment is appropriate. Banks v. Parish of Jefferson, 12-215, c/w 12-488 (La.App. 5 Cir. 1/30/13), 108 So.3d 1208, 1213. A motion for |,¿summary judgment should be granted only if there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. Breaux v. Fresh Start Properties, L.L.C., 11-262 (La. App. 5 Cir. 11/29/11), 78 So.3d 849, 851. Facts are material if they potentially insure or preclude recovery, affect a litigant’s ultimate success, or determine the outcome of the legal dispute. Hines v. Garrett, 04-806 (La.6/25/04), 876 So.2d 764, 765. Whether a particular fact is material can be seen only in light of the substantive law applicable to the case. Kline v. Farm Bureau Ins. Companies, 06-129 (La.App. *561 5 Cir. 9/26/06), 942 So.2d 1080, 1083, writ denied, 06-2576 (La.12/15/06), 945 So.2d 697.
La. R.S. 9:2800.53(6) of the LPLA defines “express warranty” as:
a representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance. “Express warranty” does not mean a general opinion about or general praise of a product. A sample or model of a product is an express warranty.
A product is unreasonably dangerous when it does not conform to an express warranty made by the manufacturer about the product if the express warranty has induced the claimant to use the product and the claimant’s damage was proximately caused because the express warranty was untrue. La. R.S. 9:2800.58; Brown v. Hudson, 96-2087 (La.App. 1 Cir. 9/19/97), 700 So.2d 932, writ denied, 97-2623 (La.1/9/98), 705 So.2d 1103; cert. denied, 524 U.S. 916, 118 S.Ct. 2297, 141 L.Ed.2d 157 (1998),
In the present ease, Dr. Sudderth and G 6 S argue that they offered affidavit and deposition evidence in support their motion, and Metalcraft did not overcome their proof with countervailing affidavits or other competent evidence. . Thus, they claim that Metalcraft failed to show that there was any genuine issue of material |1ivfact regarding the issue of express • warranty and therefore, they were entitled to summary judgment. We disagree.
Based on our de novo review of the motion for partial summary judgment, supplemental memorandum, opposition, and the exhibits presented by both sides, we agree with the trial court that there were genuine issués of material fact that precluded summary judgment. The burden of proof on a motion for summary judgment remains with the movant. La. C.C.P. art. 966(C)(2). Plaintiffs did not meet their burden of proving that they were entitled to summary judgment, as the evidence presented by both sides demonstrated that there were genuine issues of material fact as to whether or not the fire-suppression system was properly installed and whether it failed to activate at the appropriate temperature, in breach of the manufacturer’s warranty as set forth in the owner’s manual. Accordingly, we find no merit in this assignment of error.
In their second assignment of error, Dr. Sudderth and G & S argue that the. jury’s verdict regarding whether the subject product was unreasonably dangerous in construction or composition was clearly wrong. They assert that the owner’s manual for the fire-suppression system and the label attached to the fire extinguisher both provide that the fire extinguisher had an activation or actuation temperature of 175 degrees Fahrenheit, but the extinguisher failed to activate at this temperature 117during the fire. They assert that the extinguisher failed to perform according to its specifications and did not activate until the temperature reached 196 degrees Fahrenheit during testing. They also contend that the unreliability of the extinguisher was emphasized during testing when the two exemplars failed to activate at 175 degrees Fahrenheit.
Dr. Sudderth and G & S claim that the evidence shows the ambient temperature around the extinguisher reached a minimum of 250 degrees Fahrenheit during the fire. They assert that the inspection tag attached to the unit was three or four inches below the sensor bulb and it suffered damage that would have required *562 temperatures of at least 250 degrees, They note that Mr. Casellas testified that it was more probable than not that the temperatures around the unit reached significantly in excess of 175 degrees during the fire. Plaintiffs assert that the vast majority of their damage would have been avoided if the extinguisher had activated as expected and as set forth in the manufacturing specifications.
Metalcraft responds that there was overwhelming evidence to support the jury’s verdict that the fire-suppression system was not unreasonably dangerous in construction or composition. It argues that plaintiffs never identified or presented any evidence of a construction defect and that the extinguisher worked exactly as intended when tested after the fire. Met-alcraft also notes that, the two exemplars tested under the same conditions discharged ' at virtually the same ambient temperature as the subject fire extinguisher. Finally, it contends that the plaintiffs presented no evidence that the sensor valve temperature was above the specified range.when it activated during testing.
La. R.S. 9:2800.55 provides:
A product is unreasonably dangerous in construction or composition if,' at the time the' product léft its manufacturer’s 'control, the product deviated in a material way from the manufacturer’s specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer. ¡
It is the plaintiffs’ burden to prove the existence of a defect in construction or composition as defined in La. R.S. 9:2800.55. Scott v. American Olean Tile Co., 97-1080 (La.App. 3 Cir. 2/4/98), 706 So.2d 1091, 1093. A claimant' must demonstrate not only the manufacturer’s specifications or performance standards for the particular product, but also how the prod-uet materially ■ deviated from those | isstandards so' as to render it “unreasonably dangerous.” Muller v. Carrier Corp., 07-770 (La.App. 5 Cir. 4/15/08), 984 So.2d 883, 885; Jenkins v. International Paper Co., 41,566 (La.App. 2 Cir. 11/15/06), 945 So.2d 144, 150.
In a products liability action, whether a defect is unreasonably danger.ous in design or composition is a question of fact. Hines v. Remington. Arms Co., 94-455 (La.12/8/94), 648 So.2d 331, 335; Morris v. United Servs. Auto. Association, 32,528 (La.App. 2 Cir. 2/18/00), 756 So.2d 549, 557. The factual findings of the trier of fact will not be disturbed absent manifest error. Morris, 756 So.2d at 557; Rosoll v. ESCO, 549 So.2d 840 (La.1989). A reviewing court must give great weight to the conclusions of-the trier of fact. Powell v. Regional Transit Authority, 96-0715 (La.6/18/97), 695 So.2d 1326, 1329. Where there are two permissible views of. the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Ro-sell, 549 So.2d at 844-845; Wooley v. Lucksingen 09-571 (La.4/1/11), 61 So.3d 507, 554. Moreover, where'the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1313; Rando v. Anco Insulations, Inc., 08-1163, c/w 08-1169 (La.5/22/09), 16 So.3d 1065, 1088.
In the present case, the owner’s manual provides-that activation or discharge will occur when the “sensor valve temperature” rises to the system activation point, which is 175- degrees Fahrenheit. Thus, the temperature of the sensor valve or bulb itself must-reach 175 degrees. It is undisputed that it was not possible to measure the temperature of the bulb itself or the liquid inside during the testing that was performed. Plaintiffs and defendants pre *563 sented conflicting evidence as to whether the product deviated in a material way from the manufacturer’s specifications or performance standards for the product. The jury had the duty to consider the | ^conflicting testimony and to make a determination as to which evidence was the most credible.
Dr. Sudderth and G & S presented the testimony of their expert, Mr, Casellas, who opined that the fire extinguisher had a manufacturing defect because it failed to activate at 175 degrees and thus, “did not work as intended and as the manufacturer said it would.” Mr. Casellas testified that based on the evidence,' particularly the damage to the inspection tag located below the sensor and the combustible damage to plastic and wood items in the area of the sensor, the extinguisher should have activated during the fire because the evidence shows that it was more probable than not that the temperature reached well above 175 degrees at the location of the extinguisher.
Metalcraft presented the testimony of its expert, Mr. Meier, who opined that there was no' defect in the extinguisher. He opined that the unit would have discharged during the fire if it had been properly installed and if the temperature of the sensor bulb had reached 175 degrees. He testified that the evidence did not show there was enough heat during the fire to activate the extinguisher, noting that the plywood behind the extinguisher did not show signs of heat damage - and that insulated air conditioning ducts were just above the extinguisher. He also opined that the damage to the inspection tag was caused by drop down. Mr. Meier stated that he believes that the fire extinguisher discharged during testing when the temperature of the bulb reached 175 degrees Fahrenheit, in accordance with the specifications.
The jury was presented with conflicting testimony, including the differing opinions of the experts, and had to make credibility determinations. - The jury apparently did not believe that the extinguisher failed-to meet or operate in accordance with Metal-craft’s specifications. Further, the evidence did not show | mthat the extinguisher deviated in a material way from identical products manufactured by the same manufacturer, as shown during testing of the two exemplars.
There were two permissible views of the evidence in this matter, and thus, the jury’s choice between them cannot be clearly wrong. Based on all of the testimony and evidence presented, we find no manifest error in the jury’s determination that the fire suppression system did not contain a manufacturing or composition defect rendering it unreasonably dangerous. Accordingly, this assignment of error is without merit.
In their third assignment of error, Dr. Sudderth and G & S assert that the jury’s verdict regarding, whether the subject product breached an express warranty and whether the breach caused the damages at issue was clearly wrong. They argue tha¿t Metalcraft expressly warranted that the fire-suppression system would automatically activate upon ambient temperatures reaching 175 degrees .based, on the information in the owner’s manual and the label attached to .the unit. They claim that Dr. Sudderth relied on this express warranty and suffered damages due. to the breach of this warranty.
Metalcraft responds -that there was overwhelming evidence to support the jury’s verdict that there was no breach of an express warranty, It argues that there was no warranty that the unit would activate at an ambient temperature of 175 ± degrees. It.further asserts that plaintiffs *564 failed to prove that the temperature of the sensor valve was above 175 degrees when the unit activated during testing or that the area where the unit was installed reached higher than 175 degrees during the fire.
Neither the owner’s manual nor the inspection tag provides that the extinguisher would discharge at an ambient temperature of 175 degrees. Rather, | ⅞1 the owner’s manual provides that discharge will occur when the sensor valve temperature reaches the system activation point, i.e. 175 degrees. Thus, to prevail on their express warranty claim, plaintiffs had to prove that the sensor valve of the extinguisher reached 175 degrees Fahrenheit during the fire but failed to discharge.
The experts for each side offered conflicting opinions as to the temperature reached in the area of the extinguisher during the fire. As previously stated, where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Theriot, supra. It was not unreasonable for the jury to conclude that the temperature of the sensor valve did not reach 175 degrees during the fire or that the extinguisher did not fail to discharge at the specified temperature. Based on all of the evidence presented, we find no manifest error in the jury’s finding that the extinguisher did not fail to conform to an express warranty. This assignment of error is without merit.
Considering our decision to affirm the trial court’s judgment and jury verdict finding no liability on the part of Metal-craft, plaintiffs’fourth assignment of error pertaining to the amount of damages need not be addressed.
Metaleraft has answered the appeal, seeking an award of costs pursuant to La. C.C.P. art. 1920. Dr. Sudderth and G & S respond that Metaleraft has failed to make a showing of the costs it contends are warranted in its favor.
The trial court has the discretion to assess the costs of a suit in any equitable manner. Westley v. Allstate Insurance Co., 05-100 (La.App. 5 Cir. 5/31/05), 905 So.2d 1127, 1137. Generally, the prevailing party is assessed with costs, unless in some way he incurred additional costs pointlessly or engaged in other conduct which justified an assessment of costs against him. Id. When a judgment is silent as to costs, La. C.C.P. art. 1920 requires the trial court to assess the costs against |22the party cast in judgment. Law Offices of Robert Becnel v. Ancale, 02-285 (La.App. 5 Cir. 9/30/02), 829 So.2d 573, 576.
In the present case, the judgment is silent as to costs. Thus, pursuant to La. C.C.P. art. 1920, costs must be paid by plaintiffs, as judgment was rendered in favor of defendant, Metaleraft. Costs may be determined by a rule to show cause filed in the trial court.

DECREE

For the foregoing reasons, we affirm the trial court’s judgment, rendered in accordance with the jury verdict, in favor of defendants, Metaleraft, Inc., Sea-Fire Marine, a Division of Metaleraft, Inc., and Sea-Fire Marine. Costs of this appeal are to be paid by plaintiffs.

AFFIRMED.

. Mr. Casellas testified that "drop down” is "material that falls down that’s been attacked by the fire, and during the course of the fire, it will drop down into your fire area or on the floor on the lowest level.” Metalcraft’s expert, Richard Meier, testified that "drop down” is "particles and pieces of fire debris that fall from an upper area of the compartment where the fire is taking place that are burning.”